[No. G035130. Fourth Dist., Div. Three. Apr. 27, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES JAY PILSTER, Defendant and Appellant.

Counsel

Richard L. Schwartzberg for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Teresa Torreblanca and Sharon L. Rhodes, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**ARONSON, J.**—A jury convicted James Jay Pilster of assault with a deadly weapon. (Pen. Code, § 245, subd. (a)(1).) At trial, the prosecutor used defendant's prearrest statements to an investigating officer to impeach his testimonial account of the alleged crime. Because the interviewing officer failed to provide him with *Miranda* warnings even though he was handcuffed during the interview, defendant contends the trial court erred in denying his request to instruct the jury that they could consider his prearrest statements only on the issue of his credibility, per CALJIC No. 2.13.1. We agree the instruction should have been given, but conclude the error was harmless. Consequently, we affirm the judgment.

### I

### Facts

Stephen Hurley entered the patio area of a Laguna Beach brewery around 1:00 a.m. on the morning of June 22, 2003. As Hurley moved through the patio, defendant bumped into him, spinning him around. Defendant took a step toward Hurley and said "what's up." Hurley felt defendant was "definitely starting some trouble." The shorter of defendant's companions, Carlos Font, approached with his hand out. When Hurley brushed the hand away, the larger of defendant's two companions, James Haverlen, began grappling with Hurley. Someone hit Hurley on the top of his head with a beer bottle. He did not see who did it but the blow came from defendant's direction. Hurley threw a couple punches at Haverlen, who was still holding him, and told Haverlen to get away so he could locate the assailant who struck him with the bottle. The entire scuffle lasted 10 seconds. The emergency room doctor counted 30 lacerations on Hurley's shaved head; six required sutures. The doctor corroborated Hurley's assertion he had not been drinking.

According to Hurley's friend, Javier Valdivia, defendant said "what's your problem," after bumping into Hurley. Hurley shook his head, and defendant's companions positioned themselves between Hurley and defendant. The

shorter man put his hands on Hurley and told him there was no problem. A scuffle ensued, and two bouncers approached and grabbed defendant's shorter friend. Valdivia observed defendant reach over and hit Hurley on the head with the bottom part of a clear beer bottle.

Bouncer Kelly Cotton, who earlier recognized Hurley as a casual acquaintance, heard a dispute erupt in the patio area. He turned and spotted Hurley grappling with Haverlen. Cotton and the other bouncer, Raul Montes, walked toward the men. Cotton wrapped his arms around Haverlen and Montes grabbed Hurley. Cotton watched defendant approach Hurley and with "an overhand right" struck Hurley on the head with a clear beer bottle. Cotton grabbed defendant and held him until police arrived.

Montes testified all the men were "holding, shoving, [and] pushing" each other when he and Cotton approached. He had his back to defendant and his friends as he restrained Hurley, but the bottle came from the area where defendant stood.

Laguna Beach Police Officer Paul Bixby responded immediately to the fracas. According to Bixby, Haverlen appeared intoxicated. His lower lip was swollen. Font had been drinking, but was not impaired. Sergeant Eric Lee also investigated the incident. He smelled alcohol coming from defendant's person, but concluded he was not intoxicated. At the police station, Lee observed a quarter-inch abrasion on defendant's left shoulder blade.

*Defense*

Font testified he, defendant and Haverlen were standing next to a railing near the patio entrance when Hurley walked up and stood six inches in front of defendant. Hurley said something like, "what's your problem" and "I don't like the way you're looking at me." Font jumped between them and asked Hurley to move back a little. Font had his hands palm-side up and his arms bent at the elbow. Hurley stepped back and continued to scream at defendant. Font asked what the problem was and Hurley told him he did not like the way defendant was looking at him. Font told him to relax, explained they were all there to have a good time, and offered to buy Hurley a drink. Hurley continued to argue and when Haverlen put his hand on Hurley's shoulder, Hurley swung at Haverlen and charged forward into Font's shoulder. Font grabbed him around the waist. A bouncer separated the combatants. Font saw Hurley bleeding from his head but did not see how the injury occurred, and denied seeing defendant or Haverlen punch Hurley.

Haverlen testified Hurley approached their group and asked defendant if there was a problem. Defendant replied there was no problem. Hurley, who

used an aggressive tone but was not yelling, asked defendant to step outside and "settle this like men." Font stepped in and said they were not looking for trouble. Haverlen did not see Font motion with his hands or touch Hurley. When Hurley grabbed defendant by the collar, Haverlen stepped towards Hurley and repeated they were not looking to start anything. Hurley then punched him in the face, and landed a second blow on the back of his neck. When he turned around, Hurley's head was bleeding. The bouncer intervened and separated everyone until the police arrived. Haverlen denied putting his arm out or touching Hurley's shoulder, nor did he see his companions touch Hurley. He also did not see who hit Hurley, and denied responsibility for Hurley's injury. Haverlen did not recall where he put his beer during the incident. He admitted drinking a vodka tonic and two beers before the altercation.

Defendant testified he had a beer at home but drank mineral water from a green bottle once he arrived at the brewery. He did not bump into Hurley and did not notice him until Hurley said "what are you looking at?" Defendant replied he was not looking at anything. Hurley responded he did not like the way defendant looked at him and said something like "what's the matter with you." Defendant backed up slightly and said he had not been looking at him. Hurley moved to within two feet of defendant and said they should take it outside and handle it like men.

At this point, Font stepped in and told Hurley to calm down. Hurley continued to look at defendant and repeated he did not like the way defendant was looking at him and he did not like his face. Haverlen stepped forward and again informed Hurley they did not want trouble. One of his friends offered to buy Hurley a beer. When Haverlen reached toward Hurley's shoulder, Hurley threw two punches at Haverlen, who was knocked back into defendant and Font. Font grabbed Hurley around the waist in a bear hug, knocking defendant backwards into the railing. He lost track of his water bottle during the scuffle, and denied hitting Hurley with anything. He never observed Hurley's bloody head.

Cotton grabbed defendant by the neck and pushed him over the railing onto the sidewalk. Cotton walked around a column to the other side of the railing, grabbed defendant by the arm and escorted him up the sidewalk and handed him over to a police officer.

Defendant sat on the curb for about three minutes when an officer then handcuffed him. Sergeant Lee approached a few minutes later. Lee said there had been a fight and asked if defendant knew that someone had been hit on the head. Lee asked if he had been holding a bottle. Defendant admitted he had a water bottle, but denied telling Lee he swung it at Hurley or that he hit

Hurley with the bottle. Defendant also denied admitting to Lee there was a "possibility" that he had struck Hurley with the bottle. Defendant explained he informed Lee there was a possibility someone had been injured because he saw an ambulance arrive on the scene.

*Rebuttal*

Sergeant Lee testified that he escorted Hurley out of the brewery and then interviewed defendant for about 10 minutes, recording their conversation digitally. Lee asked defendant what happened. Defendant replied, "the other guy [Hurley] was . . . talking shit to him," and when defendant told him to get away, Hurley started throwing punches at him. Defendant had a bottle in his hand and started to swing it at Hurley to make him get away. Lee had not mentioned a bottle and defendant did not describe the bottle. Defendant told Lee the bouncer grabbed him and the fight ended. Asked whether he had hit Hurley while swinging the bottle, defendant conceded it was a "possibility."

The jury convicted defendant of assault with a deadly weapon, but found the allegation the victim suffered great bodily injury to be not true. (Pen. Code, § 12022.7.) The court suspended imposition of sentence and placed defendant on probation subject to certain conditions, including a 120-day jail term.

II

### DISCUSSION

Defendant contends the trial court erred when it denied his request to instruct the jury they could consider his prearrest statements to Lee only on the issue of defendant's credibility. Specifically, defendant requested CALJIC No. 2.13.1, which provides: "If you find that a defendant, following arrest, made [a statement] [or] [statements] to a law enforcement officer or officers, inconsistent with [that] defendant's trial testimony, the out-of-court [statement] [or] [statements] should be considered by you only for the purpose of testing [that] defendant's credibility as a witness. You must not consider the statement as evidence of guilt." This limiting instruction applies when the prosecution impeaches a defendant with prior statements obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*). (*Harris v. New York* (1971) 401 U.S. 222 [28 L.Ed.2d 1, 91 S.Ct. 643] [allowing prosecution to impeach a defendant with prior statements taken in violation of *Miranda*].) The trial court must give the instruction if the defense requests it and the evidence shows a *Miranda* violation occurred. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 63 [17 Cal.Rptr.3d 710,

96 P.3d 30].) Thus, defendant's right to the instruction depends on whether he was entitled to *Miranda* warnings before the investigating officer interrogated him about the altercation in the bar. To resolve this issue, we first summarize the procedural and factual background to the court's ruling.

On the first day of trial during preliminary motions (Evid. Code, § 402), the prosecutor informed the court she would not use defendant's statements to the investigating officer in her case-in-chief, explaining defendant's statement concerned his denial of the crime. Immediately before defendant testified, defense counsel asked the court to preclude the prosecutor from impeaching defendant with his prearrest statements because the officer handcuffed defendant and interrogated him about the incident but failed to advise him of his *Miranda* rights. The court replied that was "not the law[] [o]nce he takes the stand, all systems ago. . . . He doesn't get to come up here and change his story . . . ." Counsel replied he lodged the objection to preserve the record and then requested the court instruct the jury concerning prior inconsistent statements obtained in violation of *Miranda*. (CALJIC No. 2.13.1.) The court deferred discussion of defendant's requested instruction, and the testimony resumed.

During direct examination, defendant testified about his encounter with Lee. Defendant explained he had been handcuffed for three to five minutes when Lee approached and asked defendant if he had been aware that someone had been injured after being hit over the head with a bottle. Lee made the inquiry in a conversational tone without first providing *Miranda* warnings. Defendant testified he spoke with Lee. At this point, the prosecutor objected on hearsay grounds. Defense counsel asked to approach sidebar, but the court suggested a chambers conference because "I disagree with you on a point of law anyway."

In chambers, the court stated "you can detain somebody and handcuff them until you sort things out, and I don't think [you have] to Mirandize him at all. And if that was an issue, that would have been [an Evidence Code section] 402 issue . . . ." Counsel argued that once defendant was handcuffed, Lee could not question him without first advising defendant of his *Miranda* rights. The court rejected the argument, explaining that defendant's detention for investigative purposes did not require *Miranda* warnings. The court, however, permitted defense counsel to ask defendant about Lee's interrogation of him after counsel explained he merely wanted to soften the impact of the prosecutor's impeachment evidence.

Concluding his direct examination, defendant denied telling Lee it was possible he struck the victim, explaining that he told Lee it was a "possibility" someone had been injured during the melee. As recounted above, Lee contradicted defendant's version of the interview on rebuttal.

At the close of the case, the court rejected defendant's request to instruct the jury with CALJIC No. 2.13.1. The court explained the law did not require *Miranda* warnings for investigative detentions, even if the suspect is interrogated while handcuffed.

■ Defendant's right to a limiting instruction concerning statements obtained in violation of *Miranda* depends on whether the interrogating officer was required to provide *Miranda* warnings before questioning defendant. *Miranda* warnings are required "as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.' " (*Berkemer v. McCarty* (1984) 468 U.S. 420, 440 [82 L.Ed.2d 317, 104 S.Ct. 3138] (*Berkemer*).) This determination presents a mixed question of law and fact. (*People v. Ochoa* (1998) 19 Cal.4th 353, 402 [79 Cal.Rptr.2d 408, 966 P.2d 442].) We apply a deferential substantial evidence standard to the trial court's factual findings, but independently determine whether the interrogation was custodial. (*Ibid.*)

■ Custody determinations are resolved by an objective standard: Would a reasonable person interpret the restraints used by the police as tantamount to a formal arrest? (*Berkemer, supra,* 468 U.S. at p. 442; *People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1161 [59 Cal.Rptr.2d 587].)[1] The totality of the circumstances surrounding an incident must be considered as a whole. (*People v. Boyer* (1989) 48 Cal.3d 247, 272 [256 Cal.Rptr. 96, 768 P.2d 610], disapproved on another ground in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1 [38 Cal.Rptr.2d 394, 889 P.2d 588].) Although no one factor is controlling, the following circumstances should be considered: "(1) [W]hether the suspect has been formally arrested; (2) absent formal arrest, the length of the detention; (3) the location; (4) the ratio of officers to suspects; and (5) the demeanor of the officer, including the nature of the questioning." (*People v. Forster* (1994) 29 Cal.App.4th 1746, 1753 [35 Cal.Rptr.2d 705].) Additional factors are whether the suspect agreed to the interview and was informed he or she could terminate the questioning, whether police informed the person he or she was considered a witness or suspect, whether there were restrictions on the suspect's freedom of movement during the interview, and whether police officers dominated and

---

[1] The test is sometimes phrased as follows: How would a reasonable person in the suspect's position have understood his or her situation? But the issue under *Berkemer* "is *not* whether a reasonable person would believe he was not free to leave, but rather whether such a person would believe he was in police custody of the degree associated with formal arrest." (2 LaFave et al., Criminal Procedure (2d ed. 1999), Interrogatories and Confessions, § 6.6(c), p. 526.)

controlled the interrogation or were "aggressive, confrontational, and/or accusatory," whether they pressured the suspect, and whether the suspect was arrested at the conclusion of the interview. (*Aguilera,* at p. 1162.)

Here, defendant had been detained only three to five minutes before Lee approached him and questioned him about the incident. Lee did not formally arrest defendant before questioning him, and interviewed defendant as he sat on the sidewalk outside the bar. This is a significant difference from interrogation at the police station, "which frequently is prolonged, and in which the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek." (*Berkemer, supra,* 468 U.S. at p. 438.) Lee was the only officer present during the interview. According to defendant, Lee conducted his inquiry in a conversational tone, and there is no evidence he posed confrontational questions or pressured defendant in any manner. On the other hand, the prosecution did not present evidence that the officer informed defendant he had not been arrested, was not a suspect and could decline to answer questions. Moreover, the officer formally arrested defendant at the conclusion of the interview. Most important, defendant remained in handcuffs when the investigating officer interrogated him. Under all these circumstances, would a reasonable person conclude that police interrogation of a handcuffed defendant was tantamount to a formal arrest?

Defendant argued at trial that as a matter of law police officers must provide *Miranda* warnings before interrogating a handcuffed suspect. But, as discussed above, no one factor is controlling and courts must consider all the circumstances surrounding the encounter. (See also *United States v. Bautista* (9th Cir. 1982) 684 F.2d 1286, 1289 (*Bautista*) [rejecting argument defendants "automatically" arrested when handcuffed].) For example, brief handcuffing of a detainee would look less like a formal arrest if the interviewing officer informed the detainee the handcuffs were temporary and solely for safety purposes, officers considered the detainee only a witness in the investigation and advised the detainee he or she could decline to answer their questions. (See *United States v. Salvo* (6th Cir. 1998) 133 F.3d 943, 951 [informing suspect he was not under arrest, was free to leave and would not be arrested after the interview was "an important factor in finding that the suspect was not in custody"].) But these mitigating facts are absent in the present case.

██ *Miranda* warnings are not required during the course of a brief detention unless the suspect is placed under restraints normally associated with a formal arrest. When this occurs, *Miranda* warnings are required because the suspect understands the detention is not likely to be "temporary and brief" and therefore is "completely at the mercy of the police." (*Berkemer, supra,* 468 U.S. pp. 437–438.) Handcuffing conveys this message because it

is a distinguishing feature of a formal arrest. (*Dunaway v. New York* (1979) 442 U.S. 200, 215 [60 L.Ed.2d 824, 99 S.Ct. 2248] [handcuffs considered among the "trappings of a technical formal arrest"]; *United States v. Newton* (2d Cir. 2004) 369 F.3d 659, 676 (*Newton*) [handcuffing "recognized as a hallmark of a formal arrest"]; *United States v. Maguire* (1st Cir. 2004) 359 F.3d 71, 79 [handcuffs considered " 'one of the most recognizable indicia of traditional arrest' "]; *United States v. Glenna* (7th Cir. 1989) 878 F.2d 967, 972 ["handcuffs are restraints on freedom of movement *normally* associated with arrest"].)

Here, a reasonable person would conclude defendant had been placed in custody when officers handcuffed him immediately after arriving on the scene. The prosecution did not present evidence negating this assumption, such as an explanation from the officers that they placed the handcuffs on him temporarily to prevent further altercations or a categorical statement that he was not under arrest.[2] Absent these assurances, a reasonable person would assume the detention would continue unless he answered the officer's questions. Nor was there evidence defendant volunteered to speak with the police. Thus, defendant faced a custodial interrogation. The United States Supreme Court fashioned *Miranda* warnings to compensate for the coercive pressures inherent in a custodial interview, and defendant should have received these warnings before the interviewing officer questioned him about the altercation.

■ The Attorney General relies on cases permitting officers to handcuff suspects where there is reasonable cause to believe the suspect is potentially dangerous and police are conducting an on-the-scene investigation to dispel or confirm their suspicions quickly. (See *People v. Celis* (2004) 33 Cal.4th 667, 676 [16 Cal.Rptr.3d 85, 93 P.3d 1027]; *United States v. Fornia-Castillo* (1st Cir. 2005) 408 F.3d 52, 64–65; *Bautista, supra,* 684 F.2d at p. 1292.) These cases, however, deal with Fourth Amendment claims that handcuffing the suspect transformed an investigative detention into a de facto arrest without probable cause. Whether an individual has been unreasonably seized for Fourth Amendment purposes and whether that individual is in custody for *Miranda* purposes are two different issues. (*United States v. Kim* (9th Cir. 2002) 292 F.3d 969, 976.) To resolve the detention issue, courts examine whether handcuffing the defendant met the Fourth Amendment reasonableness standard. As *Newton* explains, "where an officer has a reasonable basis to think that the person stopped poses a present physical threat to the officer or others, the Fourth Amendment permits the officer to take 'necessary

---

[2] Even this evidence may not negate a finding the suspect had been subjected to custodial restraints. "[T]elling a suspect that he is not under arrest does not carry the same weight in determining custody when he is in handcuffs as it does when he is unrestrained." (*Newton, supra,* 369 F.3d at p. 676; see *United States v. Henley* (9th Cir. 1993) 984 F.2d 1040, 1042 [handcuffed suspect entitled to *Miranda* warnings even though agents informed suspect he was not under arrest].)

measures . . . to neutralize the threat' without converting a reasonable stop into a *de facto* arrest. [Citations.]" (*Newton, supra,* 369 F.3d at p. 674, original italics.) Thus, courts look to the reasonableness of the officer's actions to determine whether handcuffing exceeded the scope of the detention and transformed it into a de facto arrest.

 In contrast, Fifth Amendment *Miranda* custody claims do not examine the reasonableness of the officer's conduct, but instead examine whether a reasonable person would conclude the restraints used by police were tantamount to a formal arrest. These two distinct analytical concepts may produce different outcomes. (See *Newton, supra,* 369 F.3d at p. 677 [officers' actions reasonable under Fourth Amendment but restraints imposed during detention placed defendant in custody for *Miranda* purposes].) As *Newton* explains, "*Miranda*'s concern is not with the facts known to the law enforcement officers or the objective reasonableness of their actions in light of those facts. *Miranda*'s focus is on the facts known to the seized suspect and whether a reasonable person would have understood that his situation was comparable to a formal arrest." (*Newton,* at p. 675.)

 Considering the totality of the circumstances surrounding defendant's interrogation, we conclude he was in custody and entitled to *Miranda* warnings before officers could question him about the incident. Because the prosecution used defendant's custodial statements to impeach his account of the fight, defendant was entitled to CALJIC No. 2.13.1, which informed the jury they could consider his statements only on the issue of his credibility. Any error in failing to give the instruction, however, was harmless beyond a reasonable doubt, even assuming the *Chapman* standard applies. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].)

To determine guilt, the jury had to decide whether to believe defendant when he claimed he did not strike the victim. In assessing defendant's credibility, the jury undoubtedly considered several factors, including Lee's testimony defendant admitted a "possibility" existed he struck the victim, and defendant's denial he made this admission to the officer. The verdict demonstrates the jury disbelieved defendant's entire testimony. Thus, defendant's admission it was possible he hit the victim added little to the substantive conclusion of guilt. Once the jury unanimously and adversely resolved the issue of defendant's credibility, a guilty verdict was inevitable. Moreover, the prosecutor never argued the jury should consider defendant's statements to

Lee as admissions of guilt. Finally, the evidence pointed conclusively to defendant as the assailant, including the eyewitness testimony of Cotton, a disinterested third party and employee of the bar. Thus, failure to give the requested instruction did not result in prejudicial error.

The judgment is affirmed.

Sills, P. J., and Rylaarsdam, J., concurred.

A petition for a rehearing was denied May 30, 2006.