Filed 8/28/13  P. v. Kotz CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E055975 |
| v. | (Super.Ct.No. FVA1000704) |
| SANDRA LEE KOTZ, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Arthur Harrison, Judge.  Affirmed.

Brett Harding Duxbury, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, James D. Dutton and Donald W. Ostertag, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendant and appellant Sandra Lee Kotz guilty of first degree murder (Pen. Code, § 187, subd. (a), count 1)[1] and found true the enhancement allegation that she personally and intentionally discharged a firearm causing death. (§§ 12022.53, subd. (d).) The trial court sentenced defendant to a total indeterminate term of 50 years to life in state prison.

On appeal, defendant contends that the trial court erred in denying her motion in limine to suppress statements she made to police officers at the scene and at the police station. We disagree and affirm.

FACTUAL BACKGROUND

*Prosecution Evidence*

The victim was defendant's sister-in-law. Around May 1, 2010, the victim let defendant move in with her and was helping her to find a job.

At 2:00 a.m. on May 2, 2010, Officer Joseph Maltese responded to a dispatch call regarding a person driving around in a car, possibly with a body inside of it. When he arrived at the location, he observed defendant sitting on a curb near the end of a cul-de-sac, with two duffel bags next to her. Officer Maltese drove past defendant and turned around in the cul-de-sac and then saw her standing by a trash can, closing the lid. He stopped his car and turned on his alley light to illuminate the area. Defendant started walking toward the police car. Officer Maltese got out of the patrol car and noticed that defendant was crying and very distraught. He asked her name and what was wrong. She

---

[1] All further statutory references will be to the Penal Code, unless otherwise noted.

2

replied, "You know what's wrong." Because of the nature of the dispatch call, Officer Maltese asked for her purse, set it down, and patted her down for weapons. He then started recording their conversation. The recording was played for the jury at trial. Defendant said her mother told her to just turn herself in. Officer Maltese asked her what was wrong and what happened. She mentioned something about torture, so he asked who was torturing her. He then asked what color the car was. She said, "You know what color it is." He told her he only saw her sitting "there" and that she looked like she needed help. He said, "That's why I'm here. Okay. What's wrong? You shot somebody? Who did you shoot?" Defendant responded that her sister-in-law was torturing her. Officer Maltese asked again where the car was located. She said it was in the field, and that the car was white. Officer Maltese repeated that the police were there to help her. Defendant said she had been driving around for 10 hours and did not know what to do. He asked what kind of car it was and who it belonged to. She said it was "hers." Defendant then started talking about her ex-husband and her divorce, and she said that the victim was out of her mind. Officer Maltese said it was going to be okay, and defendant said, "No it's not. Now they're gonna know that I don't have a gun and they'll hurt me now."

Officer Maltese handcuffed defendant, read defendant her *Miranda*[2] rights, and asked if she understood them. Defendant said, "No, you said it too fast." Officer Maltese began to repeat them, when defendant said, "I already told you almost everything."

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436.

3

Meanwhile, another officer found a gun in the nearby trashcan. Officer Maltese finished reading defendant her rights and asked if she understood them. She then asked him if the officer found "[her] other one." She said she thought she put another gun in the trashcan. Defendant said her brain was "hurting" and she could not think straight. Officer Maltese said he would give her some time. Defendant said she could not take anymore, and then said, "That's my sister calling me to tell me to turn myself in." Officer Maltese tried to tell her everything was okay, but defendant said, "If I run, will you just shoot me so I don't have to go to jail?" Officer Maltese told her she was not going to run and said, "[W]e're gonna help you as much as we can." Defendant said the police did not help her with her divorce, and then she talked about her daughter.

Officer Maltese asked for the identity of the person in the back of the car, and defendant said it was her sister-in-law. He asked her questions about whether she put the bag with the guns in the trashcan when she saw him. She said, "I put it in the trashcan so that if you didn't know you didn't know." Defendant kept begging Officer Maltese to shoot her if she ran. He kept trying to calm her down. Throughout the rest of the conversation, defendant mentioned that she had rifles in her car at another location, asked if the other officers retrieved both of her bags out of the trashcan, and said her head hurt and that she had been disoriented since her divorce. When Officer Maltese asked whether she put her sister-in-law in the trunk, the backseat, or the front seat, defendant said the victim was driving and she asked her to pull over. Defendant said the victim was being "really evil" and she "could not take anymore." Defendant said, "[S]he won't be lying anymore. She won't. She will never say that to me again. Never. And she's

4

bipolar. She should be taken and killed all the time to keep from making everybody around her crazy. . . .” Defendant then rambled on about her ex-husband and her in-laws. Near the end of the discussion, as defendant was being placed in the police car, she asked, “Will you call me an attorney?”[3]

Police officers at the scene located a set of keys on the sidewalk behind defendant. One of the keys was a car key; the officers walked around the street pressing the button on the key to see if they could get any feedback from one of the cars. When none of the cars on the surrounding streets responded, they went into the nearby field. When they pushed the button, they saw lights flash and found a car in the field. They found the victim's body in the car.

Defendant was transported to the police station. Officer Cindi Sandona took defendant into the restroom to have her change out of her clothes and into a paper suit so her clothes could be collected as evidence. After defendant changed, she asked Officer Sandona if she was going to die by lethal injection. Officer Sandona asked her what she was talking about, and defendant said she had just shot her sister-in-law. Officer Sandona took defendant into an interview room that did not have any recording equipment. However, Officer Sandona decided to move her into a room with recording equipment because defendant kept making spontaneous statements about shooting her sister-in-law. Their discussion was recorded, and the recording was played for the jury at trial. At the beginning of the recording, Officer Sandona complimented defendant on the

---

[3] A transcript of this request is not included in the clerk's transcript since the trial court excluded all statements made after the request.

color of her hair, and they talked about the hair dye she used. Defendant then started saying something about how "[s]he deserved it," and about "[a]ll the lies" her sister-in-law was telling. Officer Sandona listened but then started asking questions about defendant's hair color. Officer Sandona noted that it was funny that defendant remembered dying her hair, and defendant said it was because her fingernails were dirty. Defendant started talking about how her father went into the hospital.

At trial, Martin Bocanegra testified. He said defendant called him on May 1, 2010, after not having heard from her in 15 years. Defendant said her sister told her to call him. Defendant asked how to get rid of a dead body and how to get fingerprints off a dead body. He suggested kicking the body out of a car or throwing it in a lake, and to use WD40 for the fingerprints. Defendant eventually told him she had shot someone.

*Defense Evidence*

Defendant testified on her own behalf at trial. She said she was best friends with the victim, and she moved in with her on the last day of April 2010. The morning after she moved in, the victim was out in the morning and returned home. At first, the victim was fine, but then she went into the bathroom and came out angry. Defendant tried to leave, but the victim slammed the door shut, pulled defendant by the hair, and slammed her into the couch. The victim pinned her to the floor and started slamming her head into the ground. The victim eventually got off of her and helped her to the bathroom. The victim "beat [her] up two more times," and then defendant talked her into driving her to her friend's house. The victim drove defendant in her car, but they could not find the friend's house. The victim was angry and hit defendant with her arm several times. The

6

victim started screaming at defendant, and she grabbed an antenna and hit defendant in the stomach with it. The victim pulled the car over and tried to poke defendant in the face with it. The victim told defendant to look for her address book. The victim started stabbing defendant with the antenna. Defendant looked in her bag for the address book. She had a gun in her bag so she pulled it out and shot the victim. Defendant then moved the body over and started driving around, trying to figure out what to do. She stopped at Walmart and bought some hair dye. She went back to the victim's house and dyed her hair. After that, she got back into the victim's car and called her sister. Defendant was looking for a hospital, and her sister told her to go to Bocanegra's house so he could help her. Bocanegra tried to revive the victim, but could not. He told defendant to drive to the store, where she bought some food and WD40. Bocanegra said he did not want his fingerprints on the victim's body and said he could wipe them off with WD40 so he would not get in trouble. Bocanegra directed defendant to drive to a field near his house, and he wiped the car and body with WD40 and suggested they burn the body. Defendant was disgusted with that idea. Bocanegra and defendant walked away from the car, and Bocanegra disappeared. She walked around looking for him, and ran into the police. Defendant recalled being contacted by Officer Maltese and pleading with him to shoot her. On cross-examination, the prosecutor asked her if, at that time, she knew what she did was wrong. Defendant said she knew that hurting somebody was wrong, but she could not remember what had happened before the shooting. The prosecutor then stated that she could not remember any of the details on the morning of the shooting, but she remembered all the details two years later, at the trial. Defendant replied, "Yes."

7

ANALYSIS

The Trial Court Properly Admitted Defendant's Statements to Police Officers

Defendant argues that the evidence of her statements to Officer Maltese at the scene and to Officer Sandona at the police station were improperly admitted in violation of her rights under *Miranda*. We conclude that the court properly admitted the statements.

A. *Standard of Review*

"'In applying *Miranda* . . . one normally begins by asking whether custodial interrogation has taken place. "The phrase 'custodial interrogation' is crucial. The adjective [custodial] encompasses any situation in which 'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'"" [Citation.] 'Absent "custodial interrogation," *Miranda* simply does not come into play.' [Citation.]" (*People v. Ochoa* (1998) 19 Cal.4th 353, 401.) The question of whether defendant was in custody for the purposes of *Miranda* is a mixed question of law and fact. (*Ibid.*) The first inquiry is factual—the trial court simply needs to ascertain the factual circumstances surrounding the interrogation. (*Id.* at p. 402.) Once the relevant facts are ascertained, the trial court must determine whether, under the relevant legal principles, defendant was in custody for the purposes of *Miranda*. (*Ibid.*) On appeal, we review the trial court's factual findings under the substantial evidence standard of review. (*Ibid.*) However, we review the trial court's legal determination of the custody issue independently. (*Ibid.*)

B. *Procedural Background Regarding the Field Interview*

Defendant made an oral motion, pursuant to Evidence Code section 402, regarding the admissibility of her statements made to Officer Maltese at the scene. Defense counsel acknowledged that Officer Maltese *Mirandized* her, but argued that there was "an issue of whether she actually acquiesced understanding." The court conducted a hearing during which Officer Maltese testified. He testified that, on the morning of May 2, 2010, he responded to a dispatch call and saw defendant sitting down, seeming distraught. He turned on the alley light to illuminate the area, got out of his patrol car, and asked defendant her name, and if she was okay. He started recording the conversation. Officer Maltese heard some radio traffic during which other officers at the scene advised that a body had been found in a vehicle. Officer Maltese then handcuffed defendant and read her the *Miranda* rights. When he asked if she understood, defendant said, "No, you said it too fast." He started to repeat her rights, when she said, "I already told you almost everything." He continued reciting her rights. Defendant did not verbally acknowledge that she understood, but she continued to talk to him and nodded her head like she understood her rights. Officer Maltese believed that she understood what he was saying to her. He also told another officer that came on the scene that she had been *Mirandized*. Defendant continued to talk to Officer Maltese, but at one point, she said to him, "Will you call me an attorney?"

Prior to making its ruling, the court took a recess and listened to the recording of the discussion between defendant and Officer Maltese. Defense counsel argued that there was no express acknowledgment that defendant understood her rights, even though the

9

Officer indicated that defendant nodded her head. Defense counsel requested that everything after the advisement be stricken. The prosecution argued that defendant was advised orally at least twice. He further argued that an explicit waiver was not needed but, rather, case law held that the court needed to consider the totality of the circumstances. The prosecutor pointed out that defendant first said that Officer Maltese advised her too quickly, which clearly indicated that she was trying to listen to him. The prosecutor also pointed out that defendant said she already told Officer Maltese "almost everything," and that Officer Maltese told another officer she had been *Mirandized*. Moreover, at the end of the recording, defendant asked if Officer Maltese could call her an attorney, which indicated that she knew she had the right to an attorney, but had continued to speak.

The court ruled that defendant was adequately advised and there was an implied waiver. The court concluded that the entire conversation was admissible up to the point where defendant asked the officer to call her an attorney.

C. *Defendant Was Not in Custody at the Scene*

Defendant contends that she was in custody when she made statements to Officer Maltese at the scene; thus, her statements should have been excluded since she was not advised of her rights under *Miranda* prior to questioning. She acknowledges that Officer Maltese eventually handcuffed her and advised her of her *Miranda* rights. However, she argues that since the initial interrogation was unconstitutional, her subsequent implied waiver must be evaluated for voluntariness. She asserts that her waiver was involuntary.

Therefore, she claims that all of her statements to Officer Maltese should have been excluded. We disagree.

"Custodial interrogation has two components. First, it requires that the person being questioned be in custody. Custody, for these purposes, means that the person has been taken into custody or otherwise deprived of his freedom in any significant way. [Citation.] Furthermore, in determining if a person is in custody for *Miranda* purposes the trial court must apply an objective legal standard and decide if a reasonable person in the suspect's position would believe his freedom of movement was restrained to a degree normally associated with formal arrest. [Citation.]" (*People v. Mosley* (1999) 73 Cal.App.4th 1081, 1088 (*Mosley*).) "The totality of the circumstances surrounding an incident must be considered as a whole. [Citation.]" (*People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403, fn. omitted.) Objective indicia of custody for *Miranda* purposes include: "(1) whether the suspect has been formally arrested; (2) absent formal arrest, the length of the detention; (3) the location; (4) the ratio of officers to suspects; and (5) the demeanor of the officer, including the nature of the questioning." (*People v. Forster* (1994) 29 Cal.App.4th 1746, 1753.)

"The second component of custodial interrogation is obviously interrogation. For *Miranda* purposes, interrogation is defined as any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response. [Citation.]" (*Mosley*, *supra*, 73 Cal.App.4th at p. 1089.)

Here, defendant has failed to demonstrate that she was subjected to restraints comparable to those associated with a formal arrest. When Officer Maltese initially

11

questioned her, she had not been formally arrested. Defendant was questioned at the scene, not a police station. The questioning occurred in public, on the side of the road, in plain view of anyone in the vicinity. Officer Maltese was the only officer questioning defendant, and the questions were open-ended, non-accusatory, and investigative. The officer simply asked questions to aid his investigation (i.e., What is wrong? What did they say? What color is the car? You shot somebody? Where is the car?). Officer Maltese was not aggressive or confrontational. Defendant asserts that she was distraught and disoriented. Even so, the record shows that Officer Maltese did not pressure her, and she readily talked to him. Furthermore, there were no restrictions on defendant's freedom of movement. Considering the totality of the circumstances surrounding the initial contact between defendant and Officer Maltese, we conclude she was not in custody, and there was no *Miranda* violation.

Defendant was not actually in custody until the point when Officer Maltese handcuffed her and advised her of her *Miranda* rights. She impliedly waived her rights when she nodded her head, indicating that she understood her rights. She then continued to talk with Officer Maltese. (See *Berghuis v. Thompkins* (2010) 560 U.S. 370, __ [130 S.Ct. 2250, 2261].) Indeed, defendant acknowledges in her opening brief that she impliedly waived her *Miranda* rights by continuing to talk to Officer Maltese. However, she claims that her waiver was not voluntary, since she was distraught and disoriented, the interrogation prior to her arrest was illegal, she was handcuffed, and she knew the "cat was out of the bag." As we have already discussed, there was no *Miranda* violation regarding the initial questioning. Furthermore, the record shows that when Officer

Maltese advised defendant of her *Miranda* rights, she asked him to repeat them, which indicated her interest in fully understanding her rights. After reading her rights a second time, Officer Maltese asked defendant whether she understood her rights, and she nodded, indicating that she understood. As the court noted, there was no reluctance to talk during the interview. Her waiver was voluntary. As to defendant's claim that she had already let "the cat out of the bag" and, therefore, her waiver was somehow involuntary, we disagree. After answering some questions, defendant asked the officer to call her an attorney, which indicated that she understood her rights, and that she had voluntarily continued to speak up until that point.

We conclude that the court properly admitted defendant's statements made to Officer Maltese.

D. *Procedural Background Regarding the Station Interview*

Prior to trial, defendant made an oral motion to exclude the interview with Officer Sandona that was recorded at the police station. The court conducted a hearing during which Officer Sandona testified. She testified that she was introduced to defendant and asked to assist with her needs and to stand by while she changed her clothes. Officer Sandona went into the restroom with defendant and provided her with a paper suit and feminine products. In the restroom, Officer Sandona did not say anything to defendant to elicit a response, but defendant started talking and asked if she was going to die by lethal injection. Officer Sandona asked what she was talking about, and defendant said she had killed or shot her sister-in-law, so she wanted to know if her punishment was going to be

13

a lethal injection.[4] Nothing else was said at that point, and Officer Sandona brought defendant into an interview room. Officer Sandona then told defendant she liked her hair color, and defendant said she dyed her hair to cover it up, since she felt "dirty" from killing her sister-in-law. Officer Sandona moved defendant over to an interview room that had digital recording because she realized that defendant was going to freely talk about what happened; she wanted everything recorded to make it clear that she was not asking defendant any investigative questions, but was only talking about things that were unrelated to the homicide.

Prior to making its ruling, the court listened to the recording of the discussion that took place in the interview room. The court found there was a *Miranda* violation and ruled to admit a certain portion of the tape and exclude the rest. Specifically, the court found that at the start of the recording, the conversation was not an interrogation since Officer Sandona did not ask any questions to elicit incriminating information. The court determined that about 16 pages into the transcript, Officer Sandona asked, "So then, what did he say?" The court considered that question to be the beginning of several questions that were interrogative. Thus, the court ruled to admit the first 16 pages of the conversation, but excluded the rest of the conversation as being in violation of *Miranda*.

---

[4] Officer Sandona said "sister," but apparently meant to say "sister-in-law."

E. *Miranda Was Not Implicated During the Outset of Defendant's Conversation with Officer Sandona, Since There Was No Interrogation*

Defendant now claims that Officer Sandona's initial question of "What are you talking about?" after defendant asked if she was going to die by lethal injection, constituted an interrogation under the totality of the circumstances. Thus, she argues that the trial court erred in admitting "all but the first of [her] statements [i.e., the question regarding lethal injection]." At the outset, we note that defendant failed to make this specific objection below. Rather, she previously moved to exclude the statements she made during the conversation in the interview room, which was recorded. "'The general rule is that a defendant must make a specific objection on *Miranda* grounds at the trial level in order to raise a *Miranda* claim on appeal.' [Citations.]" (*People v. Mattson* (1990) 50 Cal.3d 826, 854.) Defendant has forfeited this issue on appeal. (*People v. Rogers* (1993) 21 Cal.3d 542, 548.) In any event, we find the argument to be without merit.

"*Miranda* does not 'prohibit the police from merely listening to . . . voluntary, volunteered statements' uttered by a person, whether or not in custody, . . ." (*People v. Mickey* (1991) 54 Cal.3d 612, 648 (*Mickey*).) "[A] statement is involuntary if it is the product of coercion or, more generally, 'overreaching'; involuntariness requires coercive activity on the part of the state or its agents . . . ." (*Id*. at p. 647.)

Here, shortly before defendant arrived at the police station, she was advised of her *Miranda* rights, impliedly waived them and continued to talk to the police. She eventually asked the officer to call her an attorney. After arriving at the police station,

15

defendant was introduced to Officer Sandona, who accompanied her into the restroom and stood by while she changed her clothes. While in the restroom, defendant started talking and asked Officer Sandona if she was going to die by lethal injection. Officer Sandona had not said anything to defendant to elicit a response, so she asked defendant what she was talking about. Defendant said she had killed or shot her sister-in-law, so she wanted to know if her punishment was going to be a lethal injection. The record clearly demonstrates that defendant initiated communication with Officer Sandona regarding what she had done. In other words, "it was generally defendant who was active and [Officer Sandona] who [was] passive: [defendant] opened discussion and directed its course; [Officer Sandona] essentially responded." (*Mickey*, *supra*, 54 Cal.3d at p. 650.) Officer Sandona did not "overreach" in any way when she simply asked defendant what she was talking about. Moreover, after defendant admitted the shooting, Officer Sandona did not inquire further regarding the incident, or say anything that would be likely to elicit an incriminating response. Defendant's admission was voluntary, since there was no coercive activity by Officer Sandona.

In view of the totality of the circumstances, we conclude that Officer Sandona's question asking defendant what she was talking about did not amount to an interrogation, and the court properly admitted the evidence of that portion of their conversation.

In any event, the admission of evidence of the first portion of defendant's conversation with Officer Sandona, even if erroneous under *Miranda*, was harmless beyond a reasonable doubt. (*People v. Samayoa* (1997) 15 Cal.4th 795, 831.) The evidence against defendant was overwhelming. When the police found her, she was

16

crying and distraught. She told Officer Maltese that the victim was torturing her and was being evil, and that she "could not take anymore." Defendant told the police that the victim, "will never say that to me again" and that the victim "should be taken and killed all the time to keep from making everybody around her crazy." The police found the victim's car keys and the victim's body in the car, near defendant. Defendant identified the dead body as her sister-in-law, and she told the police where she hid her guns. Defendant also kept asking Officer Maltese if he would shoot her so she would not have to go to jail. In addition, Martin Bocanegra testified that defendant told him she had shot someone and asked him how to get rid of a dead body and how to get fingerprints off a dead body.

In view of the evidence, we conclude that the admission of the first portion of Officer Sandona's conversation with defendant was not prejudicial.

### DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST
Acting P. J.

We concur:

McKINSTER
J.

MILLER
J.