Filed 10/5/16  P. v. Vaquera CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G050801 |
| v. | (Super. Ct. No. 12NF0653) |
| OSCAR MANUEL VAQUERA, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, David A. Hoffer, Judge.  Affirmed.

Torres & Torres, Tonja R. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland, Scott C. Taylor and Paige B. Hazard, Deputy Attorneys General, for Plaintiff and Respondent.

While the police were executing a search warrant at appellant's apartment, officers questioned him outside the apartment about the contents of his computer and other personal belongings. The officers' questions centered on appellant's suspected involvement in child pornography. About an hour into the interview, after appellant admitted surreptitiously videotaping teenage boys in his bathroom, the officers took him inside his apartment and read him his *Miranda* rights. (See *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).) Appellant waived his rights and, in response to further questioning, revealed he had molested one of the boys he videotaped. Based on appellant's admissions and other evidence adduced at trial, appellant was convicted of possessing child pornography and committing lewd acts against children. On appeal, he contends: 1) his pre-*Miranda* statements should have been excluded because he was in custody when he made them; and 2) his post-*Miranda* statements should have been excluded because they resulted from the deliberate "ask first and advise later" interview technique condemned in *Missouri v. Seibert* (2004) 542 U.S. 600 (*Seibert*). Finding these contentions unmeritorious, we affirm the judgment.

FACTS

This case arises from an investigation by the Anaheim Police Department into online child exploitation. The investigation focused on peer-to-peer file sharing networks that allow users to transfer photos, videos and other information over the Internet. At one point, investigators discovered evidence of child pornography in a computer file that had been accessed by appellant's computer. They then used this information to obtain a warrant to search appellant's apartment, a second-story unit located on Leatrice Lane in Anaheim.

Headed by Nathan Fay, a team of six uniformed officers executed the search warrant on March 1, 2012. All of the officers were armed, and some of them were wearing ballistic vests with the word "POLICE" emblazoned on them. The first people they encountered at the apartment were Maria S., her daughter, and her mother, all of

2

whom resided there. After having them exit the apartment, Fay yelled out for anyone else who was inside to make their presence known, and appellant – a friend of the S. family who also lived at the apartment – came to the door. Maria's husband and her two sons, 16-year-old Jonathan and 11-year-old Miguel, also lived at the apartment, but they were not home at the time of the search.

At Fay's request, appellant exited the apartment and stepped out onto the front porch with Maria and her relatives. Then, as the search commenced, Fay asked appellant if he would be willing to go downstairs and talk. When appellant said yes, Fay and Officer Gustavo Maya escorted him to a shady spot under a staircase about 40 to 50 feet away from appellant's apartment. There, the three men stood in a triangle formation, evenly spaced apart. Appellant was not arrested, handcuffed or physically restrained in any manner. Nor did the officers inform appellant of his *Miranda* rights or his freedom to leave.

Fay was the primary interrogator. He directed the questioning, while Maya acted as an interpreter for appellant, who said he preferred to speak Spanish.[1] Fay started the interview by getting some general background information. He then asked appellant when he moved in with the S. family and how many computers were in his apartment. Appellant said he had been living with the S. family for about a year. He said there was just one computer in the apartment, his Dell laptop, which was in his bedroom. Appellant claimed he found the computer in a trash bin about a year before he moved in with the S. family, and at some point he had the computer "wiped clean" so he could download music onto it. Asked about his Internet accessibility, appellant said he did not currently have an Internet subscription, but he did have one in the past, and even without a subscription, he was able to get online by accessing his neighbor's Wi-Fi. Appellant also

---

[1] Fay also speaks Spanish, but not as fluently as Maya. At the suppression hearing, Fay testified that even if Maya had not been needed as an interpreter, departmental police and safety concerns would have dictated the presence of a second officer at the interview scene. Although the interview was audio-recorded, it does not appear the officers informed appellant of this.

3

said Jonathan and Miguel, whom he initially referred to as his nephews but later clarified were his godchildren, sometimes used his computer.

Fay then asked appellant if he had anything illegal on his computer. Appellant said he had some "porn videos" on there, but the videos were of adults, not children. He also said he never used any file sharing programs on his computer. After extensive questioning from Fay on this topic, appellant admitted using a file sharing program called Frostwire. Appellant insisted he only used the program to download music, not videos. In fact, when Fay asked him about some child pornography videos that were allegedly downloaded onto his computer in May 2011, appellant said he did not even know how to download videos. He speculated Jonathan may have downloaded the videos and insisted he never watched them himself.

Fay next asked appellant about the contents of his phone. Appellant denied having any child pornography on his phone and gave Fay consent to examine it. While Fay was looking through appellant's phone, a text message came in from appellant's mother. Appellant asked Fay, "Can I see the message I got? Uh, I'm going to talk on the phone, . . . it's my mom calling me from Mexico, that's sending me a message." Fay told appellant he could call his mother back "in a few seconds," but there is no evidence he was allowed to do so. Around this same time, Maria approached Fay and asked what was going on. Fay said he would talk to her in a minute. He asked her to wait over by the apartment and she left the area.

As the interview progressed, Fay started to receive information about the search that was going on inside appellant's apartment. Fay informed appellant the searching officers had found a camera in his bedroom closet and discovered a hole between his closet wall and the apartment's only bathroom. Appellant admitted the camera was his but claimed not to have used it in awhile. He said the hole was caused by a furniture-moving accident and he always kept it covered. Fay also told appellant a notebook containing the names of various child porn sites and movie titles had been

4

found near his computer in the bedroom. Appellant did not say anything about the notebook. However, when Fay told him paperwork in the name of Christian Arze was found by the notebook, appellant admitted using that name for work purposes.

Fay then asked appellant if he had ever videotaped anyone through the hole in his closet wall while they were in the bathroom. When appellant said no, Fay asked him why his camera contained videos of children in the bathroom. Appellant said he did not know how the videos got on his camera, but Fay was dubious. He implored appellant to tell him the truth and again asked how videos of children got on his camera. This time, appellant admitted he took the videos, which included images of Jonathan and Miguel going to the bathroom and their teenage cousin Martin taking a shower. Appellant also admitted that he videotaped Miguel while he was masturbating in the bathroom and that all of the videos were taken without the boys' knowledge. Asked why he took them, appellant said, "Because I'm stupid." He admitted knowing it was illegal to take the videos but denied being sexually attracted to children.

Turning the conversation back to appellant's computer, Fay asked him again if he had ever downloaded child pornography onto the device. Appellant said no at first. But when Fay confronted him with the fact there were child pornography videos on his computer and the police could tell which dates they had been accessed, appellant admitted viewing three of them. He also admitted that he had visited some of the websites that were listed in the notebook next to his computer. Fay then asked appellant if there were any child pornography videos on his phone. When appellant answered, "I don't think so," Fay said, "Tell me the truth . . . are there or aren't there?" Appellant said, "I actually don't remember." Then he said, "Maybe, yes, but I actually don't remember."

Fay and Maya then took appellant back up to his apartment and seated him in the living room. They told him the searching officers were going to take his computer and camera so they could examine them more closely, and appellant said that was okay.

5

They also told appellant they were going to ask him some more questions, but before doing so, they needed to advise him of his *Miranda* rights, which they did.[2] After appellant stated he understood each of his rights, Fay told him "we are going to keep talking to you about what's happening right now. Is that okay?" "I'm going to ask you some of the same questions I talked to you about a few minutes ago." Appellant replied, "That's fine," and with that, the second phase of the interview began.

Fay confirmed with appellant that his Dell laptop was the only computer in the apartment and that he had owned the computer for about two years. Fay then asked appellant if the hole in his closet wall was really made by accident. Appellant said, "No, it was on purpose" and reiterated his earlier admission about having videotaped Jonathan, Miguel and Martin in the bathroom without their knowledge. Appellant also said he transferred the videos from his camera to his computer and looked at them one time. However, he claimed he never put the videos on the Internet or shared them with anyone.

Asked if he ever touched the private parts of any of the boys in the videos, appellant admitted he touched Miguel's penis on one occasion. Explaining how that happened, appellant said he and Miguel were talking in his room one day when Miguel "started to touch himself." Then appellant grabbed Miguel's penis and started "pulling it." While masturbating Miguel with one hand, appellant videotaped the incident on his phone with the other.

Appellant told Fay he knew it was illegal to touch children in this fashion, and he was sorry for doing it. He also said he had apologized to Miguel in front of his mother Maria for the incident. According to appellant, Maria told him that if he ever did anything like that again she was going to call the police, so he refrained from any further

---

[2] Specifically, the officers informed appellant he had the right to remain silent, anything he said could be used against him in court, he had the right to have an attorney present during questioning, and if he could not afford an attorney, one would be appointed to him. (See *Miranda, supra*, 384 U.S. at p. 444.)

6

misconduct. Fay was not so forgiving. After appellant told him he had nothing more to say, he handcuffed appellant and took him into custody.

Upon searching appellant's phone, the police found the video of him masturbating Miguel. On appellant's camera they found the videos he had taken of Miguel and Martin in the bathroom. And in searching appellant's computer they found numerous videos and images of unidentified boys who were engaged in sexual acts with each other. Fay knew about most of this evidence at the time he was interviewing appellant outside the apartment.

Appellant was charged with multiple crimes, including possession of child pornography and committing lewd acts on Miguel and Martin while they were under the age of 14. Before trial, appellant moved to suppress all of the statements he made to the police. He argued the initial statements he made under the staircase were inadmissible because he was in custody and the police did not read him his *Miranda* rights. And he claimed the second part of the interview, which occurred inside his apartment after he was Mirandized, was inadmissible under *Seibert* because the police deliberately manipulated the timing of his *Miranda* warnings in order to get him to confess.

At the motion hearing, Fay testified regarding the circumstances of the interview. He said that he and Officer Maya did not threaten appellant or draw their weapons at any time, nor were they forceful or confrontational with him. Rather, the interview was "pleasant" and "polite" and everyone "got along." At the start of the interview, they even asked appellant if he wanted to sit on a bench that was located under the staircase where they were gathered, but he chose to stand instead. Asked if the interview site was visible to the people up at appellant's apartment where the search was going on, Fay said he believed so.

As far as his suspicions about appellant were concerned, Fay knew appellant's computer was associated with child pornography. But Fay did not know if appellant was personally responsible for that or if someone else in the apartment had been

7

using appellant's computer for illicit purposes. Hoping to find that out, Fay questioned appellant about his computer usage and the various evidence that was found in his apartment. However, according to Fay, he was not trying to be accusatory; he was merely trying to investigate the situation.

Testifying further, Fay said the reason he did not Mirandize appellant during the initial interview under the staircase is because appellant was not under arrest at that time and the police were still gathering information. However, after appellant admitted videotaping children in his bathroom, Fay decided to take appellant up to his apartment and read him his *Miranda* rights. Even then, appellant was not handcuffed or restrained in any fashion. At Fay's request, he simply walked up to the apartment on his own accord. Once they were inside, Fay asked appellant to take a seat in the living room, which he did. Fay estimated this was about one hour into the interview. After appellant waived his rights, they interviewed him for about another 15 minutes. Although Fay went over some of the same material during the second interview, the focus of the second interview shifted to appellant's possible involvement in child sex crimes. It wasn't until the end of this second interview that appellant was handcuffed and taken into custody.

The trial court felt it was a close call in terms of whether appellant's *Miranda* rights had been violated. However, after hearing Fay's testimony, which it described as credible, and reading the transcript of appellant's interview, the court ruled the questioning outside appellant's apartment did not constitute *custodial* interrogation, and therefore the police were not required to Mirandize appellant at that time. Given its conclusion in this regard, the court denied appellant's motion to suppress. It did not consider appellant's secondary contention that his post-*Miranda* statements were obtained in violation of *Seibert*.

At trial, Miguel testified appellant sexually molested him on multiple occasions, and Martin testified appellant touched his penis one time while he was sleeping. During closing argument, defense counsel conceded appellant possessed child

8

pornography and committed lewd acts against Miguel and Martin. However, defense counsel did contest one aspect of the charges. While Martin claimed he was only 11 years old when appellant touched his penis, the defense – based on testimony given by Jonathan – asserted Martin had already reached the age of 14 by the time the incident occurred.

In the end, the jury convicted appellant as charged of two counts each of lewd conduct on a child under the age of 14 and possessing child pornography, and one count of possessing child pornography with the intent to distribute. The jury also found true allegations that appellant committed the lewd acts against multiple victims and engaged in substantial sexual conduct with them. The trial court sentenced appellant to 25 years to life in prison.

DISCUSSION

Appellant contends the trial court erred in denying his motion to suppress the statements he made to the police. We disagree.

By requiring the police to inform a suspect of his right to remain silent before questioning, the *Miranda* decision was designed to implement the Fifth Amendment's self-incrimination clause and "to assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process." (*Miranda, supra*, 384 U.S. at p. 469.) Although the decision arose in the context of a stationhouse interview, *Miranda* applies whenever the police interrogate a suspect and "there has been such a restriction on [the suspect's] freedom as to render him 'in custody.'" (*Oregon v. Mathiason* (1977) 429 U.S. 492, 495.)

In determining whether the custody requirement has been met, we must assess the objective circumstances surrounding the interrogation to determine whether a reasonable person in the defendant's position would have felt at liberty to terminate the questioning and leave. (*Thompson v. Keohane* (1995) 516 U.S. 99, 112-113.) This turns on whether the defendant was formally arrested or his freedom of movement was

9

restrained to the degree associated with a formal arrest. (*Id*. at p. 465; *Stansbury v. California* (1994) 511 U.S. 318, 322; *People v. Leonard* (2007) 40 Cal.4th 1370, 1400.) While the trial court's factual findings on this issue are entitled to great deference on appeal, we independently examine the legal question of whether the defendant was in custody at the time he was questioned by the police. (*People v. Leonard, supra,* 40 Cal.4th at p. 1400.)

But we do not write on a blank slate. Courts have developed several factors bearing on the custody issue, including the length of the interrogation, where it occurred and the ratio of officers to suspects. (*People v. Forster* (1994) 29 Cal.App.4th 1746, 1753.) "Additional factors are whether the suspect agreed to the interview and was informed he or she could terminate the questioning, whether police informed the person he or she was considered a witness or suspect, whether there were restrictions on the suspect's freedom of movement during the interview, and whether police officers dominated and controlled the interrogation or were 'aggressive, confrontational, and/or accusatory,' whether they pressured the suspect, and whether the suspect was arrested at the conclusion of the interview." (*People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403-1404.)

Applying these factors to this case, we conclude appellant was not in custody for *Miranda* purposes when he was initially interviewed outside his apartment. In arguing otherwise, appellant rightly notes there was a police-dominated atmosphere at his apartment when the police first contacted him. However, most of the officers were there to execute the search warrant; only Officers Fay and Maya were actively involved in interviewing appellant.[3] (See *United States v. Axsom* (8th Cir. 2002) 289 F.3d 496 [defendant not in custody when questioned by only two of nine officers who were at his

---

[3] Appellant correctly notes some of the searching officers approached the interview scene from time to time to apprise Fay of the search results. However, apart from an occasional comment, those officers did not actively participate in the interview process, and they were only at the interview scene temporarily.

residence to execute search warrant].)  Moreover, the interview did not commence until after appellant voluntarily agreed to talk to the officers, and it ultimately occurred at a quiet location away from his busy apartment.  (See *United States v. Barry* (11th Cir. 2012) 479 Fed.Appx. 297 [defendant not in custody during execution of search warrant because, inter alia, he was interviewed in a quiet area].)

Being under a staircase, the interview site was somewhat secluded, but it was still out in the public, in plain view of others.  (Compare *United States v. Craighead* (9th Cir. 2008) 539 F.3d 1073, 1078 [defendant deemed in custody where during execution of search warrant the police interviewed him in a confined storage room].)  And while the officers did not tell appellant he was free to leave, they did not tell him he was under arrest or not free to leave either.  Nor did they threaten, mislead or physically restrain appellant in any way.  Rather, the interview was conducted in a cordial and professional fashion.  Fay did press appellant for answers at times, but "[e]ven a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue."  (*Stansbury v. California, supra*, 511 U.S. at p. 325.)  We recognize the inherently harrowing nature of such contacts, especially for a non-English speaker, but the law has not developed in such a way as to completely insulate people from conversations with the police merely because it frightens them.

As for the time element, the record shows appellant's initial interview lasted about an hour, which is long.  However, that period included the time Maya spent interpreting Fay's questions and appellant's answers.  The record also shows appellant was kept from speaking with Maria and his mother during this time.  But the police often separate suspects from other people when they are questioning them.  This routine police practice was not sufficient to transform appellant's initial interview into a custodial situation.  Considering all of the circumstances surrounding the interview, we do not believe appellant was in custody when the police questioned him outside his apartment.

11

Therefore, the officers were not remiss for failing to advise appellant of his *Miranda* rights at that time.

Assuming otherwise would not render appellant's post-*Miranda* statements inadmissible under *Seibert*. In *Seibert*, the police were acting pursuant to a departmental policy when they deliberately refrained from giving the defendant her *Miranda* rights when they first questioned her. Then, after she confessed, they obtained a *Miranda* waiver, covered the same ground a second time, and got her to repeat her confession. Knowing her initial confession violated *Miranda,* the police hoped her second one would pass constitutional muster.

It did not. Speaking for a plurality of the court, Justice Souter condemned this question-first-and-advise-later strategy because "when *Miranda* warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and 'depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.'" (*Seibert, supra*, 542 U.S. at pp. 613-614.) Rejecting the notion that the defendant's waiver removed the taint of the earlier *Miranda* violation, the plurality decided the "midstream recitation of warnings after an interrogation and unwarned confession could not effectively comply with *Miranda's* constitutional requirement . . . ." (*Id*. at p. 604, limiting *Oregon v. Elstad* (1985) 470 U.S. 298, which held that a warned confession following an unwarned voluntary confession is admissible so long as the warned confession is also voluntary.)

Justice Souter's plurality opinion focused on whether it would be reasonable to find the midstream warnings were effective in terms removing the taint of the earlier *Miranda* violation, irrespective of whether the violation was intentional or not. However, in his concurring opinion, Justice Kennedy made it clear *Seibert's* plurality holding should only apply in cases where the officers *deliberately* withheld *Miranda* warnings until after the suspect confessed. (*Seibert, supra*, 542 U.S. at p. 622.) "Because Justice Kennedy 'concurred in the judgment [] on the narrowest grounds' [citation], his

12

concurring opinion represents the *Seibert* holding." (*People v. Camino* (2010) 188 Cal.App.4th 1359, 1370, fn. omitted.)

This case is not *Seibert*. There is no evidence Officer Fay was following a policy that was designed to undermine *Miranda*. That doesn't foreclose the possibility that Fay was trying to do so, but his testimony at the suppression hearing – found credible by the trial judge – indicates otherwise. When asked why he did not advise appellant of his *Miranda* rights during the initial interview, Fay said it was because appellant "was not under arrest as we spoke and I was gathering information." Since an arrest or restraints tantamount to a formal arrest are the touchstone of the custody issue (*California v. Beheler* (1983) 463 U.S. 1121, 1125), this suggests Fay believed appellant was not in custody for *Miranda* purposes when he initially interviewed him. From his perspective, there simply was no need to advise appellant of his *Miranda* rights at that time, and as we have explained above, Fay was actually correct about this.

In addition to Fay's testimony about his subjective thought process, it is also helpful to examine the objective circumstances of appellant's interrogation to see if an intentional violation of *Miranda* occurred. (*People v. Camino, supra*, 188 Cal.App.4th at p. 1370.) "'[O]bjective evidence [bearing on this issue] would include the timing, setting and completeness of the prewarning interrogation, the continuity of police personnel and the overlapping content of the pre- and postwarning statements.'" (*Ibid.,* quoting *United States v. Williams* (9th Cir. 2006) 435 F.3d 1148, 1159.)

Here, there was a close relationship between appellant's pre- and post-*Miranda* confessions in terms of time, location and police personnel, and his pre-*Miranda* interrogation was rather thorough. In connection with appellant's *Miranda* waiver, Fay also made it clear he was going to ask appellant some of the same questions he posed during the initial interview. As promised, Fay did cover some of the same topics they discussed before. But the focus of the second interview soon shifted to appellant's possible involvement in child sexual abuse, a subject that was not spoken of during the

13

initial interview.  This situation stands in contrast to *Seibert*, where the police asked the defendant essentially the same questions during both the unwarned and warned interviews in order to get her to repeat the same information she had previously provided. (*Seibert, supra*, 542 U.S. at p. 606.)  This makes it much more difficult to draw an inference of a *Seibert* plan.

At bottom, we are confident – based on Fay's testimony and the objective circumstances – that Fay acted in good faith during both interviews and that he did not deliberately manipulate the timing of appellant's *Miranda* warning in order to undermine his privilege against self-incrimination.  Therefore, irrespective of whether the statements appellant made to the police outside his apartment were obtained in violation of *Miranda*, his post-*Miranda* statements were properly admitted into evidence.

DISPOSITION

The judgment is affirmed.


BEDSWORTH, ACTING P. J.

WE CONCUR:


IKOLA, J.


THOMPSON, J.

14