Filed 7/30/14  P. v. Missey CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E058253 |
| v. | (Super.Ct.No. FMB1000246) |
| AARON STUART MISSEY, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Daniel W. Detienne, Judge.  Affirmed.

Richard Power, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel, and Sabrina Y. Lane-Erwin, Deputy Attorneys General, for Plaintiff and Respondent.

1

# I

## INTRODUCTION

Defendant Aaron Stuart Missey fired a Glock pistol in his residence and threatened to kill his girlfriend and others. A jury convicted defendant of one count of making a criminal threat and one count of discharging a firearm with gross negligence. (Pen. Code, §§ 246.3, subd. (a), and 422.)[1] The court imposed a sentence of three years eight months, which the court then suspended with a grant of supervised probation.

On appeal, defendant argues the court erred in denying a motion to suppress and in admitting expert ballistics testimony. We conclude there was no error. Furthermore, even assuming any error, it was harmless beyond a reasonable doubt. We affirm the judgment.

# II

## FACTS

In 2009 and 2010, Janet and her young daughter lived in Joshua Tree with defendant and his young son. Janet had met defendant in 2009 through her "old best friend," her former boyfriend. Both men were Marines. During their relationship, defendant and Janet argued constantly about whether Janet was lying about her relationship with her former boyfriend. In January 2010, Janet moved back in with the

---

[1] All further statutory references are to the Penal Code unless stated otherwise.

2

former boyfriend but she told defendant she was staying with a girlfriend because she was scared about what defendant might do.

*A. The Shooting Incident* (*Count 2*)

In May 2010, Janet and defendant reconciled. They continued, however, to argue about the former boyfriend. On one occasion, at around 1:30 a.m., after defendant had been drinking, he became irate and began punching the front door. Then defendant loaded a pistol, shot a hole in the bed in the master bedroom, and pointed a gun at his own head. Janet, the children, and defendant's parents, who were visiting, were all in the home at the time. The children were asleep in a bedroom. Defendant's father tried to calm him down and took him outside. After defendant came back in the house, he fired another shot in the master bedroom. Janet was "[s]cared, frightened, [and] upset." Defendant's father took defendant away and drove him to San Diego. Janet discussed the shootings with defendant's mother. Janet did not report the incident to the police because defendant's parents advised her not to and she was scared. She felt she could not leave because she had nowhere else to go. She continued to sleep with defendant and to have a sexual relationship.

*B. Criminal Threats* (*Count 1*)

On June 6, 2010, Janet had been visiting her family in Ventura and defendant accused her of lying about where she had been. The argument lasted about three hours. Defendant threatened to kill Janet, her daughter, his son, and Janet's former boyfriend. Then he laughed and said he would not kill the children who were innocent but he would

3

kill Janet if she cheated on him.  Janet believed defendant was dangerous and capable of acting on his threats based on the earlier shooting incident.  She was scared for her life.  At the time, there were three guns in the house—a shotgun, a pistol, and a rifle that belonged to Janet.  The next morning Janet called her mother who contacted the police.

When a sheriff's deputy, Armando Cantu, came to the house, Janet was crying, shaken, and scared for herself and her daughter.  Janet described the shooting two weeks earlier and the threats to kill her and her daughter.  She showed the deputy the firearms kept in the master bedroom closet—a Glock .40-caliber pistol, a Ruger Ranch .223-caliber rifle, and a Mossberg shotgun.  The deputy confirmed there were bullet holes in the master bedroom and the bed's mattress.

## C.  Defendant's Interview

Deputy Cantu contacted defendant on the Marine base and advised him of his *Miranda*[2] rights.  Defendant indicated at least six times he did not want to answer questions.

When the deputy explained there was enough evidence to charge defendant with making criminal threats, defendant asked about what Janet had said but defendant also repeated, "[t]here's nothing to say" and "even if I speak, I'm still going to be charged for it."  When the deputy again asked, "is your position that you want to exercise your right to remain silent," defendant responded, "I'll admit that I lost my cool and I shot the bed

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436.

twice a couple of weeks ago because I just found out that she had been cheating on me. [¶] . . . [¶] . . . And last night, I was . . . I was intoxicated and what I told her was if she ever . . . You know. Did me wrong like that again, then I said those things. And then I just calmed down after that." He continued, "Exactly what she said. I explode and I kill everybody. You know. Just stupid dumb man's words. So yeah. I'll admit to it. I said those things." Defendant said he shot the bed because "[t]hat was the bed we made love in." He further explained that the shooting happened after Janet's former boyfriend had disclosed to defendant that Janet had been living with him, not a female roommate.

The threats to kill Janet, her daughter, and others occurred when defendant had been drinking and became angry thinking about how he had been deceived even though he was spending thousands of dollars to pay Janet's debts and to buy a reliable car for her. He admitted, "I guess the killing everybody was a little extreme."

D. *Expert Ballistics Testimony*

The prosecution also presented a ballistics expert, Tom Boyles, who testified it posed a safety hazard for defendant to fire a Glock pistol in a residence. In particular, bullets could pass through walls or ricochet and injure someone.

III

THE SUPRESSION MOTION (COUNTS 1 AND 2)

A. *The Suppression Hearing*

Deputy Cantu testified at the pretrial suppression hearing that he contacted defendant in an office at the Twentynine Palms Marine Corps base. The deputy told

5

defendant he was investigating but defendant was not under arrest. The deputy informed defendant of his *Miranda* rights. As mentioned above, defendant repeatedly said he did not want to talk. The deputy then said he planned to arrest defendant based on the information provided by Janet and that defendant's guns had been confiscated. When the deputy asked if defendant had any questions, defendant asked what Janet had said and began discussing the two incidents without further objection. The deputy did not tell defendant whether he could or could not leave. Defendant did not ask to leave. Defendant's superior officer was not present during the interview.

Defendant testified that he had been training in the field when he was notified to come to the base headquarters. He interpreted the message as a direct order. Once there, he did not feel he could leave unless he was dismissed. Deputy Cantu never informed him whether he was free to leave or not.

The trial court made factual findings that defendant was not in custody and his statements to the deputy were "not involuntary." The court ruled that—even though the deputy was "essentially ignoring [defendant's] attempt to invoke his rights"—because defendant was not in custody, *Miranda* did not apply and the statements were admissible. The court denied the suppression motion.

B. *The Interrogation*

At the outset, we conclude that any error was harmless beyond a reasonable doubt based on the evidence. (*People v. Davis* (2009) 46 Cal.4th 539, 588.) Even without defendant's inculpatory statements, the testimony of Janet and Deputy Cantu and the

6

physical evidence of guns and bullet strikes afforded substantial evidence of defendant's guilt on both counts. There was no basis at all for the jury to doubt Janet's descriptions of defendant shooting in the house twice and threatening to kill Janet, her daughter, and others. Janet's testimony was confirmed by Deputy Cantu who investigated the incidents and observed and collected the physical evidence. The evidence overwhelmingly supports defendant's convictions.

Nevertheless, we will briefly conduct the correct deferential review of the trial court's factual findings. *Miranda* applies when there is a formal arrest and a person is in custody. (*Berkemer v. McCarty* (1984) 468 U.S. 420, 440.) A custody determination "presents a mixed question of law and fact. (*People v. Ochoa* (1998) 19 Cal.4th 353, 402.) We apply a deferential substantial evidence standard to the trial court's factual findings, but independently determine whether the interrogation was custodial. (*Ibid*.)" (*People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403; *People Gamache* (2010) 48 Cal.4th 347, 385.)

"Custody determinations are resolved by an objective standard: Would a reasonable person interpret the restraints used by the police as tantamount to a formal arrest? (*Berkemer* [*v. McCarty*]*, supra*, 468 U.S. at p. 442; *People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1161.)" (*People v. Pilster, supra,* 138 Cal.App.4th at p. 1403.) A person is in custody when he feels he cannot end the interrogation and leave. The relevant factors include the location and duration of the questioning; the statements made during the interview; and physical restraints, if any. (*Howes v. Field* (2012) ___U.S. ___,

7

132 S.Ct. 1181, 1189-1190.)  Additional relevant factors are the length of detention; the ratio of officers to suspects; the nature of the questions; and the demeanor of the officers. (*Pilster,* at p. 307, citing *People v. Forster* (1994) 29 Cal.App.4th 1746, 1753.)  More factors are "whether the suspect agreed to the interview and was informed he or she could terminate the questioning, whether police informed the person he or she was considered a witness or suspect, whether there were restrictions on the suspect's freedom of movement during the interview, and whether police officers dominated and controlled the interrogation or were 'aggressive, confrontational, and/or accusatory,' whether they pressured the suspect, and whether the suspect was arrested at the conclusion of the interview.  (*Aguilera,* at p. 1162.)"  (*Pilster,* at pp. 1403-1404.)

Here, Deputy Cantu came to defendant's work location and requested to interview him privately in an office.  There was no evidence that defendant was given a military order to answer the deputy's question or told he could not choose to leave.  He was not handcuffed or otherwise restrained.  Deputy Cantu informed defendant he was not under arrest.  There was certainly no evidence of domination, control, aggression, confrontation, accusations, or pressure.  Their initial exchange was brief until the deputy told defendant matter-of-factly that he would have to arrest defendant based on Janet's information.  At that point, defendant volunteered details about what had happened and did not object again to discussing the incidents.  Considering the totality of the circumstances surrounding defendant's interrogation, we conclude that, even though the

8

deputy gave a *Miranda* advisal, defendant was not in custody and therefore *Miranda* did not apply.

Defendant eventually waived any right to refuse to answer questions when he asked the deputy to tell him what Janet had said. Therefore, this is not a case involving Fifth Amendment rights, as discussed in *Salinas v. Texas* (2013) ___U.S. ___, 133 S.Ct. 2174, 2179-2180, in which the United States Supreme Court ruled that a suspect who desires the protection of the Fifth Amendment privilege must expressly invoke the privilege at the time of the interview. Defendant voluntarily abandoned the privilege when he began talking without objection to Deputy Cantu.

IV

EXPERT BALLISTICS EVDIENCE (COUNT 2)

Defendant argues that Boyles, the ballistics expert, was not qualified to testify. Boyles had 27 years of experience in the military and had been a law enforcement officer for approximately 15 years. Boyles was also a firearms instructor for the San Bernardino Sheriff's Department.

For six years, Boyles was a Marine platoon sergeant and small tactics instructor at Twentynine Palms, providing training in safety precautions and weapons for overseas combat. Safety precautions include an understanding of the surface danger zone—the predetermined area where the round fired from a weapon will terminate at the end of its firing regimen or by ricochet. The closer the target, the greater the chance of ricochet and striking an unintended target. Boyles offered opinions about the difficulty predicting a

9

ricochet hazard based upon obstacles between the shooter and the target area. Numerous variables affect the ricochet effect. The potential for ricochet decreases the farther a bullet travels and the more materials it travels through because the bullet loses kinetic energy.

Defense counsel argued Boyles was not sufficiently qualified because he did not have a college degree and he did not publish papers or perform tests on the subject of ricochet, meaning he did not have the experience to predict accurately what the ricochet pattern would be in this case. The court found Boyles was qualified to testify as a ballistics expert, noting the evidence was relevant, many jurors know nothing about guns, and—based upon his experience—Boyles knew and understood the variables relevant to ricochet. The court noted defense counsel's argument affected the weight, not the admissibility of the evidence.

The parties argue at length about whether defendant preserved below his argument on appeal that the expert's testimony did not qualify as an accepted scientific technique under *People v. Kelly* (1976) 17 Cal.3d 24. Whether defendant waived the argument or not, we hold Boyle was qualified to testify and, furthermore, any error was harmless.

A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates. (Evid. Code, § 720, subd. (a).) Expert opinion testimony is limited to a subject "that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact. . . ." (Evid. Code, § 801, subd. (a).) The expert may

10

base the opinion on matters outside his personal knowledge that are "of a type that reasonably may be relied upon by an expert in forming an opinion" on the subject at hand (Evid. Code, § 801, subd. (b)). (*People v. Catlin* (2001) 26 Cal.4th 81, 132-133; *Brown v. Colm* (1974) 11 Cal.3d 639, 643 [medical expert not required to have experience in the particular field of his testimony as long as expert demonstrates special knowledge of the subject matter].) "'The qualification of expert witnesses, including foundational requirements, rests in the sound discretion of the trial court. [Citations.] That discretion is necessarily broad: "The competency of an expert 'is in every case a relative one, i.e., relative to the topic about which the person is asked to make his statement.' [Citation.]" [Citation.] Absent a manifest abuse, the court's determination will not be disturbed on appeal. [Citations.]' [Citation.]" (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1336.)

Here, the defense objection to Boyles involved the weight of the evidence, as opposed to admissibility. The expert testimony was relevant to the issues before the court. Boyles possessed expertise in a subject matter that would be helpful to the jury because ballistics and ricochet were matters sufficiently beyond common experience. As such, the trial court properly admitted the expert testimony.

Even assuming error, it is not reasonably probable an outcome more favorable to defendant would have resulted absent Boyle's testimony. (*People v. Clark* (2011) 52 Cal.4th 856, 940-941.) The court instructed the jurors that they were not required to accept the expert opinion, and they were free to reject it. (CALCRIM No. 332.) The witnesses' testimony and the physical evidence was substantial. Defendant had

11

recklessly fired a gun twice in a residence where his son, his parents, Janet, and her daughter were at risk of harm. As the prosecutor argued: "We don't really need an expert to tell us that bullets go through exterior and interior walls of the home" and it is unsafe to fire a gun when children are sleeping nearby. Any error admitting expert testimony was harmless and could not be the basis for a claim of ineffective assistance of counsel.

V

DISPOSITION

The trial court did not err in admitting defendant's statements and the expert ballistics evidence. Furthermore, substantial evidence rendered any error harmless.

We affirm the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

McKINSTER
Acting P. J.

MILLER
J.

12