Filed 4/7/15  In re J.R. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| In re J.R., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>        v.<br><br>J.R.,<br><br>      Defendant and Appellant. | F068730<br><br>(Super. Ct. No. 13CEJ600911-1)<br><br><br>**OPINION** |

## THE COURT[*]

APPEAL from a judgment of the Superior Court of Fresno County.  John F. Vogt, Judge.

Ann Penners Bergen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Raymond Brosterhous II, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Poochigian, Acting P.J., Detjen, J. and Franson, J.

Thirteen-year-old J.R. was found to have committed a forcible lewd act upon his seven-year-old sister (the victim) (Pen. Code, § 288, subd. (b)(1)).  He was adjudged a ward of the juvenile court (Welf. & Inst. Code, § 602)[1] and committed to the Juvenile Justice Campus for 180 days.  On appeal, J.R. contends the juvenile court erred in denying his motion to suppress statements he made to an officer before receiving *Miranda*[2] warnings.  We reverse.

### FACTS:  HEARING ON THE MOTION TO SUPPRESS

*Officer Gonzales*

On November 4, 2013, Officer Gonzales, the primary investigator on the case, was dispatched after the mother called the police department.  The mother told Officer Gonzales the victim had been molested by her brother, J.R.  The victim told Officer Gonzales that J.R. had coaxed her into the bedroom by telling her he had a surprise for her.  When she came in, he said, "'Ha-ha.  I fooled you.  I don't—there's not a surprise.'"  She tried to leave, but he prevented her.  He pushed her onto the bed.  He pulled down her pants and underwear to her knees.  As she lay on her back, he straddled her and held her arms with his hands.  She heard him pull down his shorts and underwear.  Then he put "his thing in her butt."  Gonzales established that she was referring to J.R.'s penis.  J.R. moved forward and backward with his penis "in her butt."  She was scared and she told him either no or stop.  This incident lasted about 60 seconds until J.R. got off her and pulled up his clothing.  The victim pulled up her clothing and left the room.  She told Officer Gonzales she had been molested by J.R. multiple times.  Once, after he finished, her buttocks felt wet.

After speaking to the victim, Officer Gonzales informed the mother that he was going to speak with J.R.

---

[1]    All statutory references are to the Welfare and Institutions Code unless otherwise noted.

[2]    *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

Officer Gonzales and two other officers went to the father's apartment where J.R. was staying. The officers were dressed as usual, wearing uniforms with bulletproof vests, utility belts, and firearms. First, Officer Gonzales spoke to the father outside the apartment. J.R. kept opening the door and Officer Gonzales told him to go back inside. Finally, Officer Rockwell went inside to stand with J.R. Gonzales asked the father if it would be okay if he spoke to J.R. alone. The father said yes. J.R. was not present when Officer Gonzales asked the father this question.

Officer Lujan was moving between the apartment and the patrol vehicle, but was not part of the interview of J.R.

Initially, both Officers Gonzales and Rockwell were in the bedroom with J.R. The door was closed to make J.R. more comfortable to speak openly without his father listening. J.R. told two stories. In one story, his younger brother and the victim were "humping each other" and he threatened to tell their father, and in the other story, he and the victim were just playing around. Officer Gonzales told him "to basically cut to the chase" and tell him what happened with the victim. Officer Gonzales could tell J.R. seemed like he wanted to be honest. J.R.'s eyes were watering and Officer Gonzales kept telling him, "Just—just be honest with me about what happened. Just tell me the truth about what happened." J.R. was pacing back and forth and he asked Officer Gonzales if he could speak to him alone, and he looked at Officer Rockwell, who said, "Absolutely," and left the room. At this point, Officer Gonzales asked J.R. if he ever pushed the victim onto the bed. He said, "'I threw her on the bed.'" He said he pulled down her pants and underwear to her knees. Officer Gonzales asked him if he "stuck his penis in her butt," and he said, "'Well, we didn't go all the way.'" Officer Gonzales asked him what he meant by that and he said that he put it "on her butt." He emphasized the word "on." Officer Gonzales tried to get more details, but J.R. would just say "'On—on her butt.'" He said he kept his penis "on her butt" for a couple of minutes. Officer Gonzales asked if he ejaculated. J.R. used the word "sperm" and said he "did do that on her butt."

3

J.R. teared up and expressed remorse, saying that he tried to put the incident out of his mind and forget about it.  He said it was a mistake.

Officer Gonzales estimated that his conversation with J.R. in the bedroom lasted about 15 minutes.

After this conversation, Officer Gonzales read J.R. his *Miranda* rights from a standard pre-printed card.  J.R. stated that he understood his rights and then he gave a statement summarizing what he had said already.  Officer Gonzales asked him questions and he replied that they were true or correct.  J.R. said the molestation had happened about five times.

### J.R.'s Father

J.R.'s father testified that he was driving to Madera when he received a call from J.R.'s mother's sister.  She told him to go somewhere to hide J.R. because the police were looking for them.  Instead of running, the father went back to his apartment and called the police himself to clear things up.  He spoke to J.R. and told him the police were coming. He told J.R. about the allegations of sexual contact between him and the victim.  He asked J.R. if he had done something to the victim and, if so, to tell him the truth.  J.R. said he had not done anything.  The father asked if he was sure, and he said he was.  The father said, "'Because we're going to go back and I myself am going to talk to the police officers to clear this case up.'"  J.R. said it was fine for the police to come over.

When the officers arrived, the father spoke to Officer Gonzales outside the apartment while J.R. was inside by himself.  When J.R. poked his head out once, an officer asked him to go back inside.  At that point, an officer went into the apartment with J.R., and later a second officer went inside.  The father could hear the officers talking to J.R.

Officer Gonzales asked the father if he could question J.R.  The father told Officer Gonzales he could and it was his right.  The father stayed outside waiting for a response, while Officer Gonzales talked with J.R. in the bedroom.  Officer Gonzales came out to

4

the father and said, "'Well, I spoke with [J.R.]. I questioned him, and he accepted the charges.'" The father asked Officer Gonzales what was going to happen to J.R. and Officer Gonzales said he would transfer him to Juvenile Hall.

As the officers were taking J.R., he hugged his father and told him he only admitted doing it because of what the police had said, but he had not done anything.

### Officer Rockwell

Officer Rockwell testified that he and Officer Lujan arrived to assist Officer Gonzales with the investigation that day. Officer Rockwell's main involvement was "standing by with the suspect." Initially, he was outside the apartment with Officer Gonzales. J.R. was constantly poking his head out of the front door, even though Officer Gonzales ordered him to stay inside. Eventually, Officer Gonzales asked Officer Rockwell to go inside and stand by with J.R. Officer Gonzales did not want J.R. to overhear the conversation, potentially compromising the investigation.

Officer Rockwell went inside and noticed there was no furniture in the apartment. He told J.R., "'Look, you can't be sticking your head out here,'" and he told him Officer Gonzales would be coming in to interview him. He made it clear that poking his head outside was not okay and that Officer Gonzales had sent him in for that reason. J.R. "took a seat" in the bathroom because there was nowhere else to sit in the apartment. Apparently, the process of moving in was taking place and there was no furniture. J.R. sat on the toilet and on the edge of the bathtub. Officer Rockwell stood in the doorway to the bathroom and spoke with him briefly, explaining they were there because of some allegations. Officer Rockwell could tell J.R. already knew why they were there because he made some spontaneous statements like, "'I didn't do that. I didn't—I didn't touch her.'" Officer Rockwell did not want to compromise the pending interview, so he told J.R., "'Just tell [Officer Gonzales] the truth and that's all you need to worry about doing." Officer Rockwell never mentioned a Q-tip being used to collect evidence, and he did not remember mentioning a lie detector test. The bathroom door was always open.

5

Officer Rockwell was in the apartment with J.R. for about 15 minutes, and he was in the living room with Officer Lujan most of the time. J.R. remained in the bathroom because there was no other place to sit.

On cross-examination, Officer Rockwell testified that he did not remember instructing J.R. to sit down or to go into the bathroom. Officer Rockwell stood and talked to J.R. for a couple of minutes out of the 15 or so minutes he was standing by in the apartment. He was careful not to ask J.R. any questions about the facts of the case because he was not the investigating officer. He did not recall J.R. asking anything about having his father present. J.R. seemed nervous. He was fidgeting, running his fingers through his hair, and picking at his clothing. When Officer Rockwell stepped away and went into the living room, he told J.R. that he was going to leave and let J.R. think about what he was going to tell Officer Gonzales. Officer Rockwell did not tell J.R. to stay in the bathroom and he did not stop J.R. from leaving the bathroom. Officer Lujan was standing 15 to 20 feet from the door of the bathroom. When Officer Gonzales came into the apartment, Officer Rockwell shared his impressions, telling Officer Gonzales what was said, that J.R. had knowledge of why they were there, and that he was behaving nervously.

### J.R.

J.R. testified as the sole defense witness. He said he was first interviewed in the bathroom by Officer Rockwell. J.R. sat on the edge of the bathtub and Officer Rockwell stood in front of the closed door. Another officer entered twice, whispered to Officer Rockwell, then left and closed the door. J.R. could not leave the bathroom because Officer Rockwell said he could not leave until he told him his side of the story and until they were done talking to his father. Sometimes Officer Rockwell would walk out for a few minutes to give J.R. time to think. J.R. was in the bathroom for about 40 minutes. He did not feel he could leave at any time if he chose to. He asked Officer Rockwell

6

10 or 15 times if he could see his father. Officer Rockwell told him he could not leave the apartment because he was going to be interrogated.**3**

Officer Rockwell took him into a bedroom and Officer Gonzales came in. J.R. stood in the far corner of the room and the two officers stood in front of the door. It was not possible for J.R. to leave the room and he did not feel that he could leave at any time if he chose to.

J.R. gave the officers answers that were not true because Officer Rockwell told him "the truth frees you," and they told him they would let him go if he told the truth. They said if he did not tell the truth, they would give him a lie detector test at the police station across the street. They said they would take him to the hospital if they found sperm on the victim and they would "stick a Q-tip where [he] would not want it." He asked if he could talk to his father, but Officer Rockwell said they had to interview J.R. first, so "while under pressure [he] just decided to admit it."

On cross-examination, J.R. testified that he knew why the officers were at the apartment because he and his father had called the officers to come to the apartment and take them to his mother's apartment to talk to her about the allegations that he had sex with the victim. So he had an idea what his father and Officer Gonzales were talking about when they were outside the apartment for 20 to 30 minutes; he presumed they were talking about the sexual assault allegations. J.R. admitted poking his head out the front door five to 10 times when they were talking. He did it every five minutes or so because he was concerned why his father was not coming inside. An officer told him to stop peeking out the door, but he might have continued doing it. Eventually, Officer Rockwell told him to come into the bathroom. Officer Rockwell closed the door and started talking to J.R. Officer Rockwell said, "'So what happened?'" J.R. answered, "'Nothing.'" Officer Rockwell said, "'Come on. Don't lie. If you tell me the truth, the

---

**3**    He said, "Interrogating me."

7

truth free—frees you.'" J.R. told him he did not do it and he was telling the truth. He said, "'If the truth frees you and I'm telling you the truth, how come you can't let me leave and talk to my dad?'" Officer Rockwell told him, "'Because you can't talk to your dad right now … [a]nd I know you're lying because [the victim] told us everything that happened.'" J.R. was getting confused by the things Officer Rockwell was saying. Officer Lujan would come in and whisper things to Officer Rockwell. At times, Officer Rockwell would walk out and leave the bathroom door open. J.R. did not leave the bathroom because Officers Rockwell and Lujan were watching him. J.R. wanted to go outside and talk to his father, but every time he got up, they would walk toward the bathroom. J.R. was in the bathroom for about 45 minutes.

Officer Gonzales walked in and asked J.R. to go into the bedroom to talk to him. Officer Rockwell, who also came into the bedroom, was making J.R. nervous because he kept looking at him with bold, mad eyes. J.R. told Officer Gonzales to have Officer Rockwell leave so they could talk privately. When they were alone, J.R. told Officer Gonzales what happened. After J.R. told him what he had done to the victim, Officer Gonzales left the room. The other officers stayed in the room with J.R. Then his father came in crying. J.R. asked him what was wrong. His father said the officers were going to arrest J.R. The officers let J.R. hug his father, then they handcuffed him. J.R. told his father he admitted doing it only because they told him that the truth would free him and because they did not believe what he was saying.

J.R. testified that he did not tell the officers the truth because they did not believe him. He thought the officers would take him to his mother's before any conversation, but they started interrogating him and he felt the pressure and began to think that they were trying to arrest him. He was "under pressure so he decided to say yeah, to admit it." First he told them that he and the victim always fought and she had been mad at him for two weeks. Officer Rockwell told him in the bathroom that he had to tell them exactly what the victim told them; if he did not, it would mean he was lying. Officer Rockwell

8

was asking aggressive questions and J.R. was frightened. Officer Gonzales was more patient and he did not frighten J.R.

After handcuffing J.R., the officer put him in the patrol car. It was not until then that Officer Gonzales said, "'But I still need to read you your Miranda rights.'" And then he did. J.R. did not say anything else. He just cried.

### *Juvenile Court's Ruling*

After hearing the evidence, the juvenile court ruled that J.R.'s statements to Officer Gonzales were admissible, explaining in part as follows:

> "Now, in this particular case the presence of law enforcement was initiated by the family. It was initiated in fact by the father who was present at the location. The father and the son understood that the police were going to be coming to the location and were going to be investigating this particular set of allegations. The purpose of calling the police was to— was several fold, as I understand it, but one of which was to create the platform for the minor to speak to the police. This is confirmed and corroborated by the fact that the father gave express consent for the police to do so.

> "So when you take a look at the circumstances from the get-go here, the police were invited to come to the location to do exactly what they did, talk to [J.R.]. So, you know, if we take a look at this subplot here of what happened before Officer Gonzales actually had the chance to speak to [J.R.], you know, I can see where there—it can be categorized as some disputed facts, but I think the long and short of it is that Officer Rockwell simply secured the location so that the minor would not interfere with the further conversation between Gonzales and the dad. And any contact he had with the minor, including statements that he should tell the truth, do not—do not compromise the situation by making it a threatening situation. [¶] … [¶]

> "And just to try to shorten this analysis because I've been looking at this since the issue first arose yesterday afternoon. If the contact had not been initiated by the dad, by the family, if there hadn't been this conversation between dad and Gonzales before dad authorized Gonzales to talk to the son, I think I would have no choice but to side with the request to suppress the statement. But this is—this is exactly what the authorities talk about. You know, look, the fact that this Miranda warning wasn't given, even where you have this temporary detention situation and under [section] 625[, subdivision ](c) of the Welfare and Institutions Code it says

9

it should be given, the context is different here.[4]  This is all initiated by the family.  It's voluntary from the start, so I don't see where [section] 625[, subdivision ](c) is being offended by this contact.

"And when you take a look at the operative context of the situation, everything here was initiated by the minor and his family and intended to result in a statement to Officer Gonzales.  I think that was all fairly clear, though.  Any specific conversations about—from the father to the son, 'You will give a statement,' that was never made on the record, but when you take a look at the context of this entire encounter, that's exactly the reasonable inference to be drawn.  So I think the record must reflect that for all intents and purposes from the same—from the same factual analysis all attention was focused on [J.R.], the minor, for the allegations that we're talking about here.  And under the circumstances I think he was within the meaning of [section] 625[, subdivision ](c) being detained.  But, again, the totality of the circumstances, as I've already described on the record, do not establish that a due process violation occurred.  That what occurred was exactly what was anticipated and authorized by the father and that had been prior communicated to the son.  So I'm not going to suppress the statement given to Gonzales."

---

**4**     Section 625, subdivision (c) provides in relevant part:  "In any case where a minor is taken into temporary custody on the ground that there is reasonable cause for believing that such minor is a person described in Section 601 or 602, or that he has violated an order of the juvenile court or escaped from any commitment ordered by the juvenile court, the officer shall advise such minor that anything he says can be used against him and shall advise him of his constitutional rights, including his right to remain silent, his right to have counsel present during any interrogation, and his right to have counsel appointed if he is unable to afford counsel."

## DISCUSSION

**I.      *Miranda***

      **A.      *Law***

Police officers are not required to administer *Miranda* warnings to everyone they question, only those they subject to custodial interrogation.  (*Oregon v. Mathiason* (1977) 429 U.S. 492, 495; *People v. Ochoa* (1998) 19 Cal.4th 353, 401 (*Ochoa*).)  "'Absent "custodial interrogation," *Miranda* simply does not come into play.'"  (*Ochoa, supra,* at p. 401.)  For purposes of *Miranda,* a person is in custody when there is "'a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.'"  (*Thompson v. Keohane* (1995) 516 U.S. 99, 112; *Ochoa, supra,* at p. 401.)  But he is not in custody if, under the circumstances, "'a reasonable person in [his] position would have felt free to end the questioning and leave.'"  (*People v. Leonard* (2007) 40 Cal.4th 1370, 1400.)  "Custody determinations are resolved by an objective standard:  Would a reasonable person interpret the restraints used by the police as tantamount to a formal arrest?  [Citations.]  The totality of the circumstances surrounding an incident must be considered as a whole."  (*People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403 (*Pilster*), fn. omitted.)

The key issue here is whether the questioning of J.R. was done in a custodial setting.  Courts have identified a variety of relevant circumstances to be considered as part of the custody determination.  Among them are "whether contact with law enforcement was initiated by the police or the person interrogated, and if by the police, whether the person voluntarily agreed to an interview; whether the express purpose of the interview was to question the person as a witness or a suspect; where the interview took place; whether police informed the person that he or she was under arrest or in custody; whether they informed the person that he or she was free to terminate the interview and leave at any time and/or whether the person's conduct indicated an awareness of such freedom; whether there were restrictions on the person's freedom of movement during

11

the interview; how long the interrogation lasted; how many police officers participated; whether they dominated and controlled the course of the interrogation; whether they manifested a belief that the person was culpable and they had evidence to prove it; whether the police were aggressive, confrontational, and/or accusatory; whether the police used interrogation techniques to pressure the suspect; and whether the person was arrested at the end of the interrogation. [Citations.] [¶] No one factor is dispositive. Rather, we look at the interplay and combined effect of all the circumstances to determine whether on balance they created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest." (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1162.)

A minor's age is also one of the objective factors to be considered. "[S]o long as the child's age was known to the officer at the time of police questioning, or would have been objectively apparent to a reasonable officer, its inclusion in the custody analysis is consistent with the objective nature of that test. This is not to say that a child's age will be a determinative, or even a significant, factor in every case." (*J.D.B. v. North Carolina* (2011) ___ U.S. ___, ___ [131 S.Ct. 2394, 2406], fn. omitted.)

"In reviewing *Miranda* issues on appeal, we accept the trial court's resolution of disputed facts and inferences as well as its evaluations of credibility if substantially supported, but independently determine from undisputed facts and facts found by the trial court whether the challenged statement was legally obtained." (*People v. Smith* (2007) 40 Cal.4th 483, 502; *Pilster, supra,* 138 Cal.App.4th at p. 1403 ["We apply a deferential substantial evidence standard to the trial court's factual findings, but independently determine whether the interrogation was custodial"].)

### B.     Analysis

Here, we agree with the trial court that J.R.'s contact with the police was initiated by J.R.'s father, and we believe substantial evidence supported a finding that J.R.'s encounter with the police began as a consensual one. J.R. was aware that the police visit

was requested by his father and that his father told him he (the father) was going to talk to the police about the allegations, "to clear this case up." J.R. told his father it was fine for the police to come.

But we conclude the evidence demonstrated that this consensual encounter progressed into a custodial interrogation. Three officers in uniforms, bullet-proof vests, utility belts, and guns arrived at the apartment where J.R. lived with his father. They were just moving in and the apartment was unfurnished. While Officer Gonzales spoke to J.R.'s father outside the apartment, Officer Gonzales repeatedly told J.R. to stop coming outside and to remain inside the apartment. Eventually, Officer Rockwell went inside the apartment to prevent him from coming out. Essentially, J.R. was kept inside the apartment, away from his father, by Officer Rockwell and sometimes the third officer. J.R. sat on the edge of the bathtub in the bathroom and was later taken into an unfurnished bedroom with two of the officers for questioning (although one officer later agreed to leave). The officers closed the bedroom door during the questioning. J.R. knew the officers suspected him of committing a sexual offense against the victim.

The factors outlined in *People v. Aguilera, supra,* 51 Cal.App.4th 1151 clearly support a conclusion that the questioning of J.R. amounted to a custodial interrogation. Contact with law enforcement was initiated by his father, not by J.R. His father consented to the police questioning his son, but J.R. did not. The purpose of the interview was not to question J.R. as a witness, but as a suspect. The police never told J.R. that he was free to terminate the interview, leave the apartment, or have his father present for the questioning. Officer Gonzales controlled the questioning, telling J.R. to "basically cut to the chase" after he told two improbable versions of what allegedly occurred.

Although the questioning occurred where J.R. lived, the apartment was hardly a comfortable and secure home-like environment; it was not yet furnished and the only seating was in the bathroom. Finally, J.R. was a 13-year-old boy, and no evidence

13

suggested he had any experience with the criminal justice system, such that he would understand he was free to end the questioning and leave. Indeed, we believe a reasonable 13-year-old boy in J.R.'s position would have believed he could not decline further questioning or leave the bedroom or apartment (he had been previously told he could not leave). We also believe he would have found the environment coercive and would have interpreted the situation as tantamount to a formal arrest. Accordingly, we conclude J.R. was in custody when he was interrogated and should have been read his *Miranda* rights. The trial court erred in denying the motion to suppress and in admitting J.R.'s pre-*Miranda* statements to Officer Gonzales.

## II.      Harmless Error Test

### A.      *Law*

When statements are obtained in violation of *Miranda*, as they were in this case, the error is reviewed under the federal "harmless beyond a reasonable doubt" standard set forth in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). (*Arizona v. Fulminante* (1991) 499 U.S. 279, 297, 302 (*Arizona*) [use of coerced confession not harmless error]; *People v. Cahill* (1993) 5 Cal.4th 478, 510 (*Cahill*) [federal harmless error standard applicable to inadmissible confession admitted in a California trial]; see *People v. Thomas* (2011) 51 Cal.4th 449, 498 [admission of confession harmless error where cumulative to stronger evidence]; *In re Z.A.* (2012) 207 Cal.App.4th 1401, 1422-1423) [highly inculpatory statements admitted in violation of *Miranda* not harmless beyond reasonable doubt].) In applying this standard, "'[t]he question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.'" (*Chapman, supra*, 386 U.S. at p. 23.) As the court held in *Arizona*, in finding the state failed to meet its burden of proving that use of a coerced confession was harmless beyond a reasonable doubt, "[a] confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him….'" (*Arizona, supra*, at p. 296; *Cahill, supra*, 5 Cal.4th

14

at p. 497 ["'the confession operates as a kind of evidentiary bombshell which shatters the defense'"].)

### B. Facts:  Hearing on the Petition

#### 1. Prosecution Evidence

At the hearing on the petition in this case, the mother testified that the victim told her J.R. touched her where he was not supposed to.  The victim told her that brothers do things without their parents' knowledge.  The mother testified that her separation from the father had been difficult for the children.  (The mother had a boyfriend and the father had a girlfriend.)  The victim had lied about some things to create conflicts between the mother and the father's girlfriend.  The victim had also lied to get J.R. in trouble and to get attention.  The mother believed J.R. would know it was wrong to sexually molest the victim, but they had never discussed it.

The father testified that he did not believe J.R. molested the victim.  After J.R. was taken into custody, the victim recanted and told the father the story was not true.  The father took her to the hospital for an examination because he wanted to get to the truth.  He believed the victim had lied because she had been lying and exaggerating.  The father had tried to teach J.R. right from wrong, but he had never mentioned anything about this type of act with siblings.  The father thought J.R. would not know it was wrong to sexually molest the victim.

Officer Gonzales testified to the victim's sexual molestation report in detail.  Her statements led him to believe J.R. had molested her about 19 times.

The victim testified and recanted her report of sexual molestation.  She said she had lied about it because she was angry at J.R. for beating her up.  She thought J.R. should just get in trouble with his parents, not go to jail.

An expert testified that recantation by a victim in this situation is common.

2. Defense Evidence

The doctor who conducted the examination of the victim testified that he found no physical evidence she had been sexually molested.

A defense investigator testified that she interviewed the victim about three weeks after J.R. was taken into custody. The victim told her she made up the story because she wanted someone to stop J.R. from beating her up. She was angry with him and tired of getting beat up. She wanted him to stop. She told the investigator that no sexual contact had occurred. She said she felt terrible about lying. She did not know the police would come and put J.R. in jail. She told the investigator that she had watched enough sex in movies to make things up.

### C. Analysis

In this case, we cannot say beyond a reasonable doubt that J.R.'s admission did not contribute to the juvenile court's finding that J.R. committed a forcible lewd act upon the victim. (*Chapman, supra*, 386 U.S. at p. 23.) The prosecutor argued to the court that J.R.'s admission corroborated the victim's report to Officer Gonzales, which she thereafter recanted. The prosecutor stressed that the details of J.R.'s admission were consistent with the details of the victim's report, increasing the believability of her statements.

The juvenile court stated:

> "… I have very carefully reviewed the body of evidence here and the focus of this court really does go directly to the specific facts on one act that is brought forth in the initial statement of [the victim]. As addressed in *the admissions that were made by [J.R.]* to Officer Gonzales, *and the details of it* which have been, I think, very carefully examined by counsel here in the course of the trial *have all been examined by the court in the detail that was commented by counsel.* There are a number of things that, I think, any objective trier of fact would have to sort through and reach an understanding of reconciliation of one way or the other to determine whether sufficient proof is there to establish a criminal act beyond a reasonable doubt." (Italics added.)

16

The court explained it believed the victim had a motive to recant, but not a motive to lie; yet the court had trouble seeing a sexual predator in 13-year-old J.R. Nevertheless, when the court examined the details of the situation, it was convinced beyond a reasonable doubt that sexual contact, as described by the victim to Officer Gonzales, had occurred.

The court also found that J.R. appreciated the wrongfulness of his act, as follows:

> "In that regard there was testimony of the parents. There was also testimony, quite frankly, of *the context of the statement obtained by Officer Gonzales in which he examined the emotional state of [J.R.] in some detail.* And I believe that, quite frankly, the overall context of the situation[,] the reasonable inferences to be drawn from the body of evidence and the physical acts clearly point to a conclusion that [J.R.] did know these contacts with [the victim] were wrong and he understood them to be." (Italics added.)

Under the circumstances of this case, we believe J.R.'s admission, which supported the victim's report of sexual molestation in detail, almost certainly convinced the juvenile court that the victim's recanted report was true. Although the court found the victim's report credible and believed she lacked motive to lie about what happened, J.R.'s corroborating admission would have removed any doubt the court had about the truth of her report in light of her recantation and evidence of her recent lies and exaggerations. We believe that in all likelihood the court relied on J.R.'s admission to bolster the victim's report—this is not a case in which there are "numerous, disinterested reliable eyewitnesses to the crime whose testimony is confirmed by a wealth of uncontroverted physical evidence." (*Cahill*, *supra*, 5 Cal.4th at p. 505.) We further believe J.R.'s admission assisted the court in determining that J.R. understood the wrongfulness of his act.[5] Accordingly, we must conclude J.R.'s admission might have contributed to the juvenile court's finding that J.R. sexually molested the victim, and thus the erroneous use

---

[5] "Children under the age of 14 [are incapable of committing crimes], in the absence of clear proof that at the time of committing the act charged against them, they knew its wrongfulness." (Pen. Code, § 26, subd. One.)

17

of that admission was not harmless beyond a reasonable doubt.  (*Chapman, supra*, 386 U.S. at p. 23.)

We stress that our conclusion in no way minimizes the tragic abuse that may have befallen a seven-year-old girl at the hands of her brother.  However, we are bound by the legal test we must apply and the state of the evidence before the juvenile court.

## <u>DISPOSITION</u>

The juvenile court's findings and orders are reversed.