Filed 2/16/22  P. v. Fuentes CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>JOSE LUIS HUAPE FUENTES,<br><br>     Defendant and Appellant. | A164266<br><br>(Kern County<br>Super. Ct. No. SF019123A) |

     Appellant Jose Luis Huape Fuentes was tried before a jury and convicted of multiple sex offenses against his two biological daughters, who were minors at the time of the crimes.[1]  He contends:  (1) his confession to deputies during an interview at his home should have been excluded at trial as having been made during a custodial interrogation without the advisements required under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*); (2) his confession was involuntary because it was motivated by one deputy's promise of leniency; (3) his wife improperly opined at trial that one of her daughters was telling

---

     [1]     This matter was transferred by the California Supreme Court on December 20, 2021, from the Fifth Appellate District (appeal No. F078986) to the First Appellate District (appeal No. A164266).

1

the truth about the charges; (4) his son should have been permitted to testify that in his opinion, appellant had not committed the sexual assaults; and (5) the abstract of judgment should be amended to reflect a stay of one count under Penal Code section 654.[2]  We order the abstract modified but otherwise affirm.

## I.  BACKGROUND

Appellant and his wife Maria were married in 1991 and have three children together:  Jane Doe 2 (JD2), born in 1992, Jane Doe 1 (JD1), born in 2002, and a son E., who was born in 2007.  Appellant also has two sons from a previous marriage.  In 2015, JD2 moved out of the house to live with her future husband and eventually had a child.

In 2017, Maria got into a car accident while JD2 was a passenger and appellant, blaming Maria for the accident, stopped giving her money for household expenses.  This led to marital discord and in January 2018, Maria took JD1 and E. and moved out of appellant's home and in with JD2 and her family.

Shortly afterwards, JD1 broke down at school and disclosed to a counselor that appellant had been sexually abusing her for many years.  The counselor, a mandated reporter, referred the case to Child Protective Services and contacted the school's resource officer, Kern County Sheriff's Deputy Diego Barajas.  Deputy Barajas contacted an investigator with the Department, Senior Deputy Steve Vasquez, who interviewed JD1 and Maria.

---

[2]      Further statutory references are to the Penal Code unless otherwise indicated.

2

JD2 was separately interviewed that same day and revealed that appellant had sexually abused her as well. Maria authorized the deputies to facilitate a pretext call between JD1 and appellant, and she obtained a restraining order for the deputies to serve on appellant.

On January 25, 2018, JD1 made monitored calls to appellant after conferring with Deputy Vasquez, who wrote down certain things for her to say and suggested a pregnancy ruse. JD1 called appellant and told him she was stressed out at school, did not want to be with him anymore, and was worried because she had not gotten her menstrual period and might be pregnant. Appellant told her to take pills and repeatedly said he did not want her mother or older sister to know. He denied raping her. In another monitored call the next day on January 26, he told her he would get a pill for her and would be with her.

On the evening of January 26, 2018, Deputies Vasquez and Barajas went to appellant's home to serve a signed restraining order on him and possibly obtain a statement.[3] Appellant initially denied having sexual contact with either of his daughters, but eventually admitted having long-term sexual relationships with both of them, beginning at age 10 for JD1 and age 12 for JD2.

---

[3] Deputy Barajas wore a body camera which captured the entire interview. The video from that camera (with the exception of the portions of the conversation relating to immigration status, which the court excluded as irrelevant) was introduced as Exhibits 1B and 2B at trial, and has been reviewed by this court.

An amended information was filed charging appellant with three counts of sexual intercourse or sodomy with a child 10 years of age or younger as to JD1 (§ 288.7; counts 1–3); two counts of continuous sexual abuse of a child under 14 as to JD1 and JD2 (§ 288.5, subd. (a); counts 4, 9); forcible oral copulation of a minor as to JD1 (former § 288a, subd. (c)(2)(C); count 5); forcible rape as to JD1 and JD2 (§§ 261, subd. (a)(2), 264, subd. (c)(1) and (2); counts 6 and 7), and forcible lewd conduct as to JD2 (§ 288, subd. (b)(1); count 8). Several of the counts included an allegation under the One Strike law that there were multiple victims (§ 667.61, subd. (e)(4)), and one of the counts of forcible rape (count 6) included One Strike allegations that the crime was committed in the course of a kidnapping and that appellant had committed a specified offense against a minor who was 14 years of age or older (§§ 667.61, subds. (e)(1), (m)).

JD1 testified at trial that appellant had forced her to have sexual intercourse more than 100 times beginning when she was in the second or third grade. There were also about 50 occasions when appellant attempted sexual intercourse with her but stopped because someone coming into the house had overheard him. The incidents usually occurred in appellant's bedroom when Maria was not at home. A few times, appellant had forced JD1 to orally copulate him, and he tried having anal sex with her about 10 times, but she successfully resisted him. The last time appellant had sexual intercourse with JD1 was a few days before JD1 finally reported the abuse to school officials.

4

JD1 wanted to tell her mother and sister about the sexual abuse, but she was afraid they would hate her. JD1 denied that she was making up a story about the abuse because her mom was divorcing appellant. When JD2 was still in high school and lived in the home, JD1 had seen appellant on top of JD2, thrusting on top of her with his penis out.

JD2 testified that she had sexual intercourse with appellant two or three times a week beginning when the was 12 and continuing until she was 18. He tried to have anal intercourse as well, but she resisted. Appellant told JD2 she was beautiful and he loved her, and he warned her not to tell her mother about the abuse because her mother would blame her for everything and stop loving her. JD2 feared that appellant would harm her if she defied his wishes, and appellant often spoke to her about his association with drug dealers and other unsavory individuals. JD2 felt that appellant looked at her as if she was a "sexual toy" "like if—like if he desired me, if he just wanted me to be there for him."

In defense, appellant presented the testimony of his adult son Luis Huape Fuentes, who had not lived in the same house as appellant since 2013, but visited frequently. Luis described JD2 as having a strong personality and frequently confronting appellant. He contrasted her personality with that of JD1, whom he described as less independent. JD2 lived close by after she was married and was frequently at appellant's home. Luis had not observed anything unusual between appellant and his daughters and never saw appellant be inappropriate with them.

5

Asked about the car accident involving Maria and JD2, Luis testified that it had torn the family apart, with JD2 being very upset that appellant "wouldn't help out."

The jury convicted appellant of all counts except the sexual intercourse or sodomy on a child under 10 that was charged in count 1, on which it could not reach a unanimous verdict, and the forcible oral copulation charged in count 5, on which it convicted appellant of the lesser included offense of misdemeanor battery (§ 242).[4] It also found the various One Strike allegations true.

Appellant was sentenced to prison for an aggregate term of 105 years to life, consisting of consecutive, statutorily defined terms of 25 years to life for counts 2 and 3 (§ 288.7, subd. (a)), a consecutive term of 25 years to life under the One Strike law for count 6 (§ 667.61, subds. (a), (e)) and consecutive terms of 15 years to life under the One Strikes law for counts 4 and 9 (§ 667.61, subds. (b), (e)). Sentence on counts 7 and 8 was stayed under section 654, and the misdemeanor sentence on count 5 was run concurrently with the remainder of appellant's sentence.

## II. DISCUSSION

### A. *Admissibility of Statements Made During Interrogation*

Appellant argues that the court erred in admitting evidence of the confession he made during the interview in his home because he was legally in custody but was not advised of his *Miranda* rights. We find no error requiring reversal.

---

[4] Count 1 alleged that the crime was committed between July 7, 2008, and July 1, 2010, when JD1 would have been five to seven years old.

6

1.  General Principles

Once in custody, a suspect "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." (*Miranda, supra*, 384 U.S. at p. 479.) "*Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'" (*Oregon v. Mathiason* (1977) 429 U.S. 492, 495.) A "custodial" interrogation is one in which the suspect's freedom of action is curtailed to a " ' "degree associated with formal arrest." ' " (*People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403, quoting *Berkemer v. McCarty* (1984) 468 U.S. 420, 440.)

Determining the custodial nature of an interrogation depends on the "objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." (*Stansbury v. California* (1994) 511 U.S. 318, 323.) " '[C]ustody must be determined based on how a reasonable person in the suspect's situation would perceive his circumstances.' " (*People v. Linton* (2013) 56 Cal.4th 1146, 1167.)

In determining whether an interrogation is custodial, courts will consider "the location, length and form of the interrogation, the degree to which the investigation was focused on the defendant, and whether any indicia of arrest were present." (*People v. Moore* (2011) 51 Cal.4th 386, 394–395.)

7

Other pertinent circumstances are whether the encounter was initiated by the police, whether the suspect agreed to the encounter, whether the suspect was advised he was free to leave or under arrest, whether there were restrictions on the suspect's freedom during the interview, whether the officers manifested a belief that the suspect was guilty and whether the police were aggressive, confrontational or accusatory.  (See *People v. Potter* (2021) 66 Cal.App.5th 528, 539–540 (*Potter*); *People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1162.)  "No one factor is dispositive.  Rather, we look to the interplay and combined effect of all the circumstances to determine whether on balance they created a coercive atmosphere."  (*Ibid.*)

"The question whether defendant was in custody for *Miranda* purposes is a mixed question of law and fact." (*People v. Ochoa* (1998) 19 Cal.4th 353, 401.)  Although we rely on the trial court's factual findings to the extent they are supported by substantial evidence, where, as here, " '[t]he facts surrounding an admission or confession are undisputed to the extent the interview is tape-recorded,' those facts as well as the ultimate legal question are 'subject to our independent review.' " (*People v. Wall* (2017) 3 Cal.5th 1048, 1066.)

2. <u>Section 402 Hearing</u>

Appellant filed a motion in limine seeking to exclude the statements made during the interview at his home as having been taken in violation of *Miranda.*  The court held a hearing under Evidence Code section 402 at which it considered the testimony of Deputies Vasquez and Barajas and reviewed the

video footage from a body camera worn by Deputy Barajas during the interview. This evidence revealed the following:

Deputy Vasquez and Barajas went to appellant's home to serve the restraining order that had been obtained by Maria and to see if appellant would make any statements. Appellant spoke only Spanish, and Deputy Barajas went primarily as a translator because Deputy Vasquez was not fluent in that language. Both deputies wore uniforms, but neither one drew a weapon of any type at any time during the interview.

The deputies asked appellant if he would speak with them, and he agreed. Asked where he wanted to be interviewed, appellant invited the deputies inside the home, where he spoke to them for over two hours. Deputy Barajas advised appellant that he would be acting as a translator for Deputy Vasquez, although he asked some of his own questions as well. Neither deputy said anything to appellant about the restraining order during the interview, although they did advise him of the order when he was arrested at the termination of the interview.

Once inside, Deputy Vasquez sat with appellant at the kitchen table while Deputy Barajas sat to his immediate left. The deputies initially asked appellant a number of general questions having to do with the composition of the family and the circumstances under with Maria had moved out with the children. They then advised appellant that JD1 had accused him of molesting her. Appellant initially denied ever committing such acts. The deputies told appellant (falsely) that JD1 was pregnant and that appellant's DNA had been found inside her. Deputy

9

Vasquez stated that it would not be rape if JD1 was a willing participant. Appellant denied knowing that JD1 was pregnant and claimed he was not responsible. Appellant agreed to give the deputies a DNA sample so they could determine whether the "baby" was his.

Appellant continued to deny that he had impregnated JD1, and the deputies urged him to tell the truth. Deputy Vasquez told appellant that his calls with JD1 had been recorded. Appellant asked to hear the recordings and was told they would play them in a little while. Appellant then said he was going to be honest and did not want his children to suffer for his mistakes. He wanted them to come back to the house to live even if he was not with them.

Appellant admitted having had intercourse with JD1 several times, although he denied that he used force. He at first said they had been having sex for a short period of time, but later said it had been going on for about five years, since she had gotten her period at age 10. Appellant said they had been having sexual intercourse about twice a month, mostly in his bedroom. Appellant admitted that he had licked JD1's vaginal area a few times and had grabbed and sucked on her breasts.

The deputies then asked appellant about his older daughter, JD2, and he initially denied ever having sex with her. After Deputy Vasquez told appellant he had interviewed JD2, appellant admitted engaging in sexual intercourse with her as well, from when she was about 12 years old until the time she was almost married. He admitted licking her vagina, but denied

trying to have anal sex.  Appellant was arrested at the end of the interview.  He was never read his *Miranda* rights.

The trial court ruled that appellant's statements were admissible because although the interview constituted an interrogation by law enforcement, it was not custodial in nature and *Miranda* did not apply.

3. Analysis

Applying the relevant factors here, we conclude that the interview with officers was noncustodial when it began.  Two deputies came to appellant's home shortly after 6:00 p.m., a time when most people are awake.  Neither of them ever drew a weapon, and appellant was expressly told at the outset that Deputy Barajas was there as a translator.  The deputies asked appellant where he wanted to speak with them, and appellant invited them inside.  Once inside, the deputies sat at the table with appellant and calmly asked him questions, and appellant responded in kind.  The tenor of the interview throughout was low key and matter of fact.  Appellant was not explicitly told he was free to terminate the interview, but neither was he told that he was under arrest, and he was not restrained in any way during the questioning.

To be sure, the deputies did convey to appellant their suspicions that he had molested JD1.  "But *Miranda* warnings are not required '. . . *because the questioned person is one whom the police suspect*.' [Citation.]  While the nature of the police questioning is relevant to the custody question, police expressions of suspicion, with no other evidence of a restraint on the person's

11

freedom of movement, are not necessarily sufficient to convert voluntary presence at an interview into custody." (*Moore, supra,* 51 Cal.4th at p. 402.)

"[C]ourts have generally been much less likely to find that an interrogation in the suspect's home was custodial in nature. [Citations.] The element of compulsion that concerned the Court in *Miranda* is less likely to be present where the suspect is in familiar surroundings." (*United States v. Craighead* (9th Cir. 2008) 539 F.3d 1073, 1083.) In *Beckwith United States* (1976) 425 U.S. 341, 346, for example, *Miranda* advisements were not required when the defendant, who was suspected of tax fraud, invited two Internal Revenue Service agents into his home and spoke to them after they had indicated he was under investigation. (See also *United States v. Panak* (6th Cir. 2009) 552 F.3d 462, 467 [45 minute to one-hour interview in "familiar surroundings" of defendant's home was not custodial]; *United States v. Parker* (4th Cir. 2001) 262 F.3d 415, 419 [interview of defendant in her home was not custodial where she was not restrained in any way and no weapons were drawn]; *People v. Breault* (1990) 223 Cal.App.3d 125, 135 [no custody where two officers came to house to question defendant about ownership of marijuana plants and told defendant he was not under arrest].)

This is not to say that an interview inside a home cannot have the trappings of a custodial interrogation when the suspect has been deprived of his or her freedom of action in a manner similar to situations in which a suspect is taken into custody at a police station. (E.g, *Orozco v. Texas* (1969) 394 U.S. 324, 325–327

12

[*Miranda* warnings were required when officers entered defendant's room at a boardinghouse at 4:00 a.m., awakened him, began questioning him, and advised him he was under arrest and was not free to leave]; *Craighead*, *supra*, 539 F.3d 1073 [suspect detained inside the home by eight officers, some of whom unholstered weapons, and was questioned in back room of house with entry blocked by officer].) Appellant notes that the deputies falsely told appellant that JD1 was pregnant and that his DNA had been discovered inside of her, but the use of deceptive practices is not relevant when determining whether a defendant was in custody. "Whatever relevance this fact may have to other issues in the case, it has nothing to do with whether respondent was in custody for purposes of the *Miranda* rule." (*Mathiason*, *supra*, 429 U.S. at pp. 495–496.)

On balance, we conclude that a reasonable person would have felt free to terminate the interview up until the point that appellant made the incriminating statements regarding JD1. The interview was not custodial up until this point, and appellant's confession with regards to JD1 was admissible notwithstanding the absence of a *Miranda* advisement before it was made.

The deputies began questioning appellant about the crimes involving JD2 once he had confessed to the crimes involving JD1. It is a closer question as to whether the interview had become custodial by this point. Arguably, once appellant confessed to multiple felonies involving JD1, there is no likelihood a reasonable person in his shoes would have believed he was free

13

to simply terminate the interview and have the police leave his house.  (See *Cushman v. State* (Fla. App. 2017) 228 So.3d 607, 618 [after confession, interview was custodial because defendant would not have believed he was free to leave]; compare *Potter*, *supra*, 66 Cal.5th at p. 539 [interview after confession was not necessarily custodial; question is whether under totality of the circumstances, defendant would have felt free to leave].)  Indeed, when appellant confessed to having sex with JD1, he prefaced his remarks by stating, "I know that you're going to take me, right?", suggesting he (and any reasonable person) would have understood he would be arrested, and would thus be in custody, after he confessed to the crimes involving JD1.

But assuming the interview became custodial after he confessed to having sex with JD1, we find the admission of the subsequent statements harmless beyond a reasonable doubt, which is the standard under which we measure prejudice when there is error admitting statements without a *Miranda* warning. (*People v. Elizalde* (2015) 61 Cal.4th 523, 542; *Chapman v. California* (1967) 386 U.S. 18, 24.)  The admissible evidence showed (1) JD1 testified at trial to numerous acts of sexual intercourse with appellant over at least a five-year period; (2) appellant had confessed to deputies that he sexually abused JD1 for many years; (3) appellant's responses to JD1 in the pretext calls were incriminating and consistent with his having committed those acts, even if he did not explicitly state that he had sexual intercourse with JD1; (4) JD2 testified that appellant had also repeatedly had sexual intercourse with her during her

14

teenage years; (5) JD2 would have been the same approximate age as JD1 when JD1 was abused; (6) appellant had the same access with and relationship to JD2 as he did to JD1 (biological father living in the home) and the acts JD2 described were similar to those described by JD1; and (7) JD1 had witnessed appellant having sex with JD2, thus corroborating JD2's story.

The statements which should have been excluded all pertained to the acts involving JD2, so they would have had no effect on the counts in which JD1 was the named victim (counts 1–6). As to the counts involving JD2 (counts 7–9), it is simply inconceivable that a jury which believed JD1 (and appellant's confession to the crimes underlying those counts) would have rejected the testimony of JD2 and believed that appellant did not also commit those crimes, particularly when JD1 had witnessed appellant molesting JD2. Appellant's trial counsel attempted to suggest that both girls were lying because appellant and their mother were getting a divorce and they were aligned with their mother, but the jury clearly rejected this theory. The verdict on the counts involving JD2 was "surely unattributable to the [confession]." (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279; *People v. Neal* (2003) 31 Cal.4th 63, 87.)

B. *Involuntary Statements: Promise of Leniency*

Appellant argues that his statements should have been excluded because Detective Barajas promised him he would be treated more leniently if he confessed. Assuming the issue was not forfeited by his failure to raise it as a ground for suppressing

15

the statement (*People v. Ray* (1996) 13 Cal.4th 313, 339 (*Ray*)), we disagree.

Any express or implied promise of leniency or advantage to the accused made by an officer is sufficient to make a confession involuntary if it is the motivating cause of the confession. (*Ray*, *supra*, 13 Cal.4th at p. 339.) However, investigating officers are not precluded from discussing advantages that will naturally accrue if the accused speaks truthfully about the crime. (*Id.* at p. 340.) Only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable are prohibited. (*Ibid.*)

Here, when appellant was still denying the allegations made by JD1, Deputy Barajas asked him, "Do you want to spend the rest of your life in jail?" When appellant said no, Deputy Barajas responded, "Well, mm, we have to say the truth, sir." Asked by Deputy Vasquez what he told him, Deputy Barajas (who had been speaking to appellant in Spanish) responded, "I said the—keep lying to us isn't going to get you anywhere. I said you need to be honest. I said we know you're lying to us. We're gonna play you the recorded calls. I said just help yourself, tell the truth. I said you don't want to be, you know, in jail forever."

This fell short of a promise of leniency: Deputy Barajas did not offer a shorter sentence in exchange for a confession, and the mere reference to a lengthy prison sentence did not render the confession involuntary. (See *People v. Holloway* (2004) 33 Cal.4th 96, 115 [detectives' reference to possibility of death penalty and

16

statement that defendant would benefit from "giving a truthful, mitigated version of the crimes" was not improper]; *Ray*, *supra*, 13 Cal.4th at p. 340 ["a confession will not be invalidated simply because the possibility of a death sentence was discussed beforehand"].)  Assuming appellant had some subjective expectation or hope that he would be sentenced more leniently (i.e, that he would not be in jail forever) if he told the truth, the deputies made no express or implied promise to that effect. " ' "[M]ere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary." ' " (*People v. McWhorter* (2009) 47 Cal.4th 318, 357.)

Even if the reference to a life term could be construed as an implied promise that appellant would receive a more beneficial sentence if he confessed, it does not appear that the reference to a life sentence was a motivating cause of the confession.  (*Ray*, *supra*, 13 Cal.4th at p. 339.)  After Deputy Barajas referred to the life sentence, appellant continued to deny having sex with JD1, and it was not until the deputies convinced appellant that they had recorded his phone calls with JD1 that he indicated a willingness to confess.  Then he stated that he would tell the truth because he wanted the best for his family and wanted them to come back to the home—a motivation quite different than the

17

avoidance of a lengthy sentence.[5] (See *Linton*, *supra*, 56 Cal.4th at p. 1176 [confession not involuntary if coercive police activity was not motivating cause of confession].)

Significantly, after appellant had confessed to sexual contact involving JD1 and JD2, Deputy Barajas stated on the record that he had not promised anything to appellant in exchange for his confession. Although appellant responded that Deputy Barajas has suggested it would be better for sentencing purposes if appellant was honest, Deputy Barajas disputed this and appellant then proceeded to provide more details about the crimes involving JD2. Appellant's decision to keep talking after Deputy Barajas clarified that he had not promised appellant anything with respect to sentencing shows that appellant's motivating cause for confessing to the crimes was indeed to help his family, not to secure a lesser sentence.

## C. *Maria's Testimony that She Believed JD1*

Maria testified on direct examination that she believed JD1 when deputies first told her that JD1 claimed appellant had sexually assaulted her. Asked whether she believed JD1 "now," defense counsel objected on the ground that the issue was one for the trier of fact. The trial court sustained the objection and Maria did not answer. Appellant contends that the first question, regarding whether Maria had believed JD1, was prosecutorial misconduct and that defense counsel's failure to object was

---

[5]    After confessing to molesting JD1, appellant said he didn't care if he gave up his whole life to pay for the harm he had done to her.

ineffective assistance of counsel. There was no error requiring reversal.

Lay opinion about the veracity of particular statements by another is inadmissible. (*People v. Melton* (1988) 44 Cal.3d 713, 744 (*Melton*).) This is because the trier of fact is as competent as the witness to weigh evidence of credibility and draw a conclusion. (*People v. Torres* (1995) 33 Cal.App.4th 37, 47.)

But assuming the court should have not allowed Maria to testify that she believed JD1 when she was informed of the allegations by deputies, the error was patently harmless under any standard of review. The testimony was brief, and even if Maria had not testified that she thought JD1 was truthful, the jury would have understood from Maria's conduct (cooperating in setting up the pretext calls, obtaining a restraining order, testifying in favor of the prosecution) that she in all likelihood believed JD1. (See *Melton*, *supra*, 44 Cal.3d at p. 745.) The jury was instructed with CALCRIM No. 105 that it alone should determine the credibility of witnesses. (*People v. Homick* (2012) 55 Cal.4th 816, 879.) There was no insinuation that Maria based her opinion regarding JD1's truthfulness on evidence that had not been presented to the jury, and the admissible evidence supporting the conviction of the crimes involving JD1 was strong. (*People v. Riggs* (2008) 44 Cal.4th 248, 300–301.) To the extent the prosecutor's question was misconduct, it did not have any effect on the verdict, and the failure to object was not prejudicial.

D.  *Exclusion of Character Evidence*

Appellant's son Luis testified on behalf of the defense and described the family dynamics.  At the close of his direct examination, defense counsel asked Luis whether he thought appellant had sexually assaulted JD1 and JD2, to which Luis replied, "no."  The prosecutor objected to this evidence and the answer was stricken.  Appellant contends the trial court should have admitted the answer as character evidence offered by a criminal defendant to prove conformity with such character under Evidence Code section 1102, subdivision (a).  We disagree, but in any event, the exclusion of the evidence was not prejudicial.

A defendant may present opinion evidence of his own character to prove the lack of a disposition to commit an offense.  (*People v. Stoll* (1989) 49 Cal.3d 1136, 1153 [defendant charged with sex crimes can present expert testimony regarding "lack of deviance"].)  However, a witness cannot express an opinion regarding a defendant's guilt or innocence.  (*People v. Duong* (2020) 10 Cal.5th 36, 60.)  " '[O]pinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact.  To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt.' "  (*Id.* at pp. 60–61.)

Here, the question to Luis was not framed as one regarding appellant's character:  it effectively asked Luis to offer an opinion as to whether appellant was guilty.  The trial court did not abuse its discretion in excluding the evidence.  (*People v. Doolin* (2009)

20

45 Cal.4th 390, 437 [abuse of discretion is standard for evaluating erroneous exclusion of character evidence].)

Moreover, even if we assume that appellant should have been permitted to reframe the question as whether, in Luis's opinion, appellant had the character traits of a sexual deviant, there is no reasonable probability appellant would have obtained a more favorable result had Luis answered "no". (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1311 [prejudicial effect of erroneous exclusion of character testimony evaluated under *People v. Watson* (1956) 46 Cal.2d 818, 836].) It was clear from Luis's testimony that he supported his father and did not believe he was guilty. Stating so explicitly would not have changed the result of this trial, particularly when he had already testified that he never saw appellant act inappropriately toward the victims.

E. *Abstract of Judgment*

As the Attorney General concedes, the abstract of judgment does not reflect that the sentence on count 7 was stayed under section 654. It should be amended accordingly.

III. DISPOSITION

The abstract of judgment shall be amended to reflect that the sentence of 15 years to life on count 7 was stayed under section 654, and a copy of the amended abstract of judgment shall be forwarded to the Department of Corrections and Rehabilitation. The judgment is otherwise affirmed.

21

_____

NEEDHAM, J.

We concur.

_____

JACKSON, P.J.

_____

BURNS, J.

*People v. Huape Fuentes* / A164266